DETROIT & CLEVELAND NAVIGA-TION COMPANY, a Michigan Corporation, as owner of THE Steamers WESTERN STATES and THE CITY OF DETROIT III, and of the dock at the foot of Third Street, Detroit, Michigan, Libelant,

v.

THE Steamer ELBERT H. GARY, her engines, boilers, etc., Respondent.

United States Steel Corporation, claimant of THE Steamer ELBERT H. GARY, Cross Libelant,

THE Steamer SUPERIOR, her engines, boilers, etc., and Northwest Steamships Limited, Impleaded Respondents.

Civ. 12580.

United States District Court
E. D. Michigan, S. D.

March 31, 1958.

Foster, Meadows & Ballard, and John A. Hamilton, Detroit, Mich., for plaintiff.

Watson, Lott & Wunsch, Detroit, Mich., and Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for defendant.

McCreary, Hinslea & Ray, Cleveland, Ohio, and Hill, Lewis, Andrews, Granse & Adams, Detroit, Mich., for impleaders.

O'SULLIVAN, District Judge.

On August 31, 1952, the Steamer E. H. Gary, owned by respondent, collided with the Steamer Western States, owned by the libelant, which was then tied up at libelant's dock at the foot of Third Street in the City of Detroit, Michigan. The Western States was pushed against another boat owned by libelant, the City of Detroit III which was between the Western States and the dock, and the latter boat was pushed against the dock owned by libelant, resulting in damage to both boats and the dock. Respondent admits liability, and the question for decision is the amount of libelant's damages.

A cross-libel was filed by the respondent, and a third boat, the Steamer Superior, and its owner were impleaded, respondent charging libelant and said third boat with negligence. Such claims, however, were abandoned.

Surveys of the damage to the boats and dock were made by various experts. There was a wide variance between the estimates of these experts as to the reasonable cost of making necessary repairs. In addition to its assertion that the libelant's estimates as to cost of repairs were excessive, respondent claims that the cost of repairs to the boats and dock are, under the circumstances of this case, not the proper measure of damages. Respondent's claim in this regard is bottomed upon the contention that libelant's

two boats were obsolete, had been withdrawn from use in the lake traffic as passenger boats, were not worth being repaired, and that the only damages that could be awarded to the libelant would be the difference in the market value of these boats immediately before and after the casualty. Respondent further contends that inasmuch as the libelant's dock had been condemned by the City of Detroit prior to the casualty, and subsequent thereto was taken over by the city under the judgment of condemnation, for the same price as had been awarded to the libelant in the condemnation proceedings prior to the casualty, there should be no allowance for damages to the dock.

Before attempting to resolve the differences between the various experts as to the cost of repairing the boats and dock, it is necessary for the Court to decide whether the cost of repairs was, under the circumstances of this case, the appropriate measure of damages. The resolution of this question is not without difficulty. No cases have been cited which have sufficiently analogous factual backgrounds as to be authoritative on the issue that this Court must decide.

Libelant, Detroit & Cleveland Navigation Company, had for many years operated a fleet of passenger boats on the Great Lakes. Its operation of its passenger boats ended with the close of navigation in the year 1950. The boats Western States and City of Detroit III, were thereupon tied up at libelant's dock and remained there up to the time of the casualty involved in this case. Libelant's Board of Directors, following the season of 1950, during which time the libelant had sustained losses from the operation of its boats, decided to suspend their operation. The following resolution was adopted on March 8, 1951:

"Resolved, that this Board of Directors approves and adopts the recommendation of the President that the company suspend all transportation operations, the announcement of which is to be made at such time as in the discretion of the President shall be deemed most advisable."

Prior to the casualty in question, the City of Detroit had commenced condemnation proceedings to acquire libelant's dock at the foot of Third Street. Prior to the casualty there was a jury's verdict finding necessity and awarding damages in the amount of $450,000. Libelant appealed that case to the Supreme Court of Michigan, contesting the jury's verdict of necessity and the amount of the award. The case was pending on appeal at the time of the casualty, and the condemnation judgment was thereafter affirmed by the Supreme Court of Michigan on January 5, 1953. City of Detroit v. Detroit Cleveland Navigation Co., 335 Mich. 528, 56 N.W.2d 375.

The two boats in question had steel hulls and wooden superstructure. They were what is known as "side-wheelers." The Western States was built in 1902 and the City of Detroit III in 1907. Testimony established that the passenger business on the Great Lakes had been declining prior to the time of the casualty, and continued thereafter. A history of this decline was given by Reverend Edward J. Dowling of the faculty of the University of Detroit. He testified that in 1915 there were sixteen companies operating Great Lakes passenger boats, which at one time consisted of a fleet of fifty-five boats. At the time of the casualty, this fleet had been reduced to some four boats owned by the libelant company; two boats, the North America and South America, operated by the Georgian Bay Line; the Steamer Aquarama, running between Detroit and Cleveland, and the Milwaukee Clipper, running between Ludington, Michigan, and Milwaukee, Wisconsin. His testimony was limited to the American boats plying the Great Lakes.

Libelant did not repair the boats in question, nor its dock, and these boats with others of libelant's fleet were ultimately sold. The Western States was first offered for sale in November, 1954,

and in December of that year was sold on a contract for $50,000. This sale, however, was never completed and the Western States was finally sold in July, 1956, for $25,000. The City of Detroit III was offered for sale and sold on June 21, 1956, with two other boats owned by libelant company, for a total price of $90,000.

Respondent's witness, Robert D. Smith, describing himself as a ship broker, testified that late in 1951 he talked with one Kolowich, then President of libelant company. This witness was interested in selling libelant's boats as a broker, and apparently Kolowich indicated that he would give consideration to such a sale. Smith testified as to his efforts to find purchasers for the boats for possible conversion into oil barges for ocean traffic. He found no purchasers. One of the obstacles to such sale, he asserted, was the difficulty of moving the boats from the Great Lakes to the seaboard. This witness further testified that at and around the time of the casualty he knew of no one who would be interested in buying these boats for use in the Great Lakes passenger traffic.

Following the commission of respondent's conceded tort, other events, including the affirmance of the condemnation judgment, occurred rather quickly, which made such changes in the affairs and circumstances of libelant's company as to lead ultimately to its decision to sell its boats and to cease all operation of passenger boats on the Great Lakes. The last expression (prior to the casualty in question) of future plans of libelant company is contained in its President's report of March 3, 1952, wherein he said:

"As you know, the company did not operate its vessels during the year 1951. Any decision for resumption of vessel operation will have to take into consideration the fact that the City of Detroit has now condemned all of the company's river front property at Detroit, leaving the company no Detroit terminal out of which to carry on passenger and freight business. This problem is one of several perplexing situations *which will have to be solved before operation can be resumed.*"

From this it appears that this company had not then abandoned all intention of resuming operations, but recognized problems that had to be solved, "before operation can be resumed". Such resumption of operations, however, was still within its contemplation. Events occurring after this casualty, and possibly the casualty itself, contributed to the libelant's ultimate decision not to resume operations. Its mounting problems are recited in its Board's resolution of July 1, 1953:

"Whereas, this Company has, by reason of the uncertainty with respect to mooring of its vessels, not operated said vessels in either passenger or freight service since the close of the 1950 season of navigation, and

"Whereas, the Interstate Commerce Commission has issued to this Company, in Docket No. W–378, a second amended certificate of convenience and necessity under date of July 23, 1948, effective September 6, 1948 authorizing service by this Company as a common carrier by self-propelled vessels in interstate or foreign commerce during the season of navigation on the Great Lakes in the transportation of passengers and their automobiles, commodities generally, and automobiles, between ports and points in the Great Lakes as therein set forth, and

"Whereas, said certificate of convenience and necessity has no value to this company in view of the inability of this company to operate its said vessels without shore facilities in Detroit and Cleveland, as well as in other ports and points authorized to be served, and

"Whereas, the Interstate Commerce Commission claims that the

continued holding of such second amended certificate of convenience and necessity constitutes this company a carrier within the meaning of Section 5 of the Interstate Commerce Act [49 U.S.C.A. § 5],

"Resolved, that it is the judgment of the Board of Directors of Detroit and Cleveland Navigation Company that said second amended certificate of convenience and necessity should be surrendered and abandoned.

"Further resolved, that the Secretary of this Corporation be and he hereby is authorized and directed to notify the Interstate Commerce Commission of this action and to cause to be prepared and executed by him such instruments or other documents as may be required or convenient in order to effectuate the surrender and abandonment of said second amended certificate of convenience and necessity."

At some time in, or prior to, the year 1951, libelant company became interested in acquiring the Denver-Chicago Trucking Company, Inc. Then lacking authority from the Interstate Commerce Commission to operate such a company, its stock was acquired by the President of libelant company with funds borrowed from that company, subject to his agreement to sell it to libelant when approval of the Interstate Commerce Commission could be obtained. Authority from the Interstate Commerce Commission to operate this trucking company was denied because of the fact that libelant company still carried a license as a common carrier on the Great Lakes. It was for that reason, apparently, that the libelant company decided to give up its certificate of authority as such common carrier. There is evidence, however, that in the year of the casualty, 1952 the President of libelant expressed his opposition to surrendering its water rights because he still contemplated operating on the river and told of his plans therefor.

■ This Court is satisfied that it cannot say that on the date of the casualty August 31, 1952, and for a reasonable time thereafter, libelant would have been unjustified in proceeding to repair its boats. The respondent's liability arose at the time of commission of its tort.

"It is elementary that a wrongdoer in a collision is liable for the damages to the vessel as they exist at the moment of their creation." Shipowners & Merchants Tugboat Co. v. United States, 9 Cir., 205 F.2d 352.

The question of whether it was practicable for libelant to have repaired its boats appears to this Court to depend upon whether the owners of these boats would have had any reasonable justification for going ahead with such repairs. Events which occurred subsequent to the casualty and the later circumstances dictated the inadvisability of making these repairs. This should not be controlling upon the question of the damages which accrued at the time of, and immediately following, the casualty. There is no doubt that the lake passenger traffic was declining at the time of this casualty, as it had been for a long period of time prior thereto. However, it did not end on the day of this casualty, and has not ended yet. Others continued this business on the Great Lakes and were so operating at the time of the trial in 1957.

The following facts persuade this Court that it would be wrong to find that the only value of these boats on the date of the casualty was for scrap, which is the basic contention of respondents here:

(1) The annual report of the libelant for the year ending November 30, 1948, gave its plans for future operations:

"Plans have been formulated for the year 1949 to include Put-in-Bay Island and Cedar Point, Ohio, as ports of call on daily voyages between Cleveland and Detroit, thus permitting the company to operate

an excursion business from both cities in connection with regular operations. The regular overnight service from both Cleveland and Detroit will be reinstated this year.

"Your Board of Directors has arranged for the conversion of the Steamer Greater Detroit, the newest and largest passenger carrying vessel on the Great Lakes, from a coal-burning to an oil-burning ship at a substantial cost. Estimates have been furnished the company that the installation cost will be entirely recovered in the first year of operation as an oil burning ship by savings in labor and fuel costs.

"I think you will all agree that the results of the last fiscal year show a striking improvement over the previous accounting period, and it is the pledge of the Management and the Employees of your company that this year will result in an even better showing. To the many stockholders among you who either travelled on our ships in the past year or helped to advertise our service to others, we want to express our many and sincere thanks."

(2) In the annual report of March 29, 1950, he had this to say about future plans:

"Since the fall lay-up, work on converting the Steamers City of Detroit III, City of Cleveland III, Western States and Eastern States from coal-burning ships to oil-burning ships has been carried on, so that all of the passenger ships of the company will be oil fueled by the start of the 1950 season. Experience in operating the Steamer Greater Detroit during 1949 indicates that the cost of making the installations will be entirely recovered within a very short period of time by reason of the savings in labor and fuel costs thereby made possible. To those of you who in the past have objected to the smoke and cinders aboard our ships, we invite

you to sail aboard our oil-burning ships this coming summer and see for yourselves what your company is doing to make your investment in it a secure and profitable one.

"Daily excursion trips from Detroit and from Cleveland in conjunction with the overnight daily service between those two cities proved a profitable source of revenue and will be continued in 1950. Vacation cruises to Mackinac Island, Sault Ste. Marie, Harbor Springs and Chicago, and overnight service to Buffalo will again be offered at prices to meet every purse. A descriptive folder is enclosed.

"Your company is confident that the continuance of these profitable operations, together with the inauguration of a palletized package freight operation and an expanded program for the carriage of motor vehicles, together with further operating economies, will result in a net profit in 1950."

(3) The President's report of March 20, 1951, had this to say:

"The results of operations for the year ended November 30, 1950, are disappointing, although the operating loss is more than offset by gains realized on the disposition of certain assets. Without attempting in any way to create an alibi it is obvious that the year 1950 was an abnormal year because of (1) inability to arrive at settlements with labor, resulting in a delay in fitting out the ships which caused a higher cost for fitting out, (2) the unseasonable weather which was encountered during most of the sailing season, resulting in a greater sales resistance and an abnormal number of cancellations, (3) the increase in labor costs, resulting from wage increases which were forced upon the company, (4) the disaster which befell the SS City of Cleveland III on June 25, 1950, which necessitated last minute revision of the sailing sched-

ules, and (5) the adverse publicity resulting from the accident which emphasized in the minds of prospective passengers the terrible disaster which befell one of the ships of a competing passenger line at the close of the 1949 navigation season."

(4) The conversion of the libelant's fleet of boats from coal to oil cost somewhere between $250,000 and $300,000. It is not to be believed that the owners of these boats would have spent this amount of money on boats that were otherwise than in proper condition. Likewise, such an investment would not have been made in boats then inevitably destined for the scrap heap. This was in 1949 and 1950, two years or more before the casualty.

(5) In the President's report of March 3, 1952, commenting upon the company's operations for the year ending November 30, 1951 he said:

"As you know, the company did not operate its vessels during the year 1951. Any decision for resumption of the vessel operations will have to take into consideration the fact that the City of Detroit has now condemned all of the company's river front property at Detroit, leaving the company no Detroit terminals out of which to carry on its passenger and freight business. This problem is one of several perplexing situations which will have to be solved before operations can be resumed."

(6) The expert, Robert D. Smith, discussed the decline of lake passenger traffic. He said there was a steady decline in this business prior to World War II, but that during the war and for a period thereafter this business picked up sharply. This was due to restrictions on the use of automobiles, crowding of other means of travel, and somewhat to the public's changing taste in recreational activities. From this the Court asks whether, in the fall of 1952, the owners of a fleet of lake passenger boats

were without justified hope that the public fancy would again permit the profitable operation. This Court does not believe that cases should be decided upon the opinions of economists or other experts not sworn as witnesses. However, while the Court does not rely upon it as an authority, the following quotation might well have been the thought in 1952 of the owners of a fleet of lake boats:

"This is not a firm prediction, but a revival of the passenger business on the lakes seems probable. Superexpressways are fine but there is nothing soul satisfying about driving hundreds of miles at breakneck speed, seeing nothing but a passing blur.

"Nor does the soul find surcease on the swank new trains with all of their plush comforts.

"But out on the broad waters that reflect nature's every mood, with their infinite changes from glassy calm to crashing storm, there one may find peace."

(Free Press Marine Writer, Detroit Free Press, January 6, 1958).

(7) The witness Meno, who surveyed the boats in question immediately following the casualty, described how these boats had been carefully put up in such a way as to be ready to be put back in service. They were not dismantled and there was no evidence that the owners had abandoned plans for their future use.

(8) In October, 1953, underwriters paid $82,765.05 to adjust the loss involved. Of this $80,000 was for the unrepaired damage to the boats.

(9) As late as 1955, libelant acquired the stock of the Dominion Transportation Company, parent company of the Owen Sound Transportation Company. This company operated boats in lake passenger traffic. There was some discussion by the Directors of the libelant company of using what boats it still had

in connection with the operation of the Owen Sound Company.

■ The evidence is clear that these boats were usable in lake traffic and had only a few years before been converted to oil burners. They had been operated profitably. This Court's opinion is that it was practicable for the owners to have had them repaired following the casualty. The events which happened soon after this tort was committed should not now be transplanted into the state of affairs as they existed immediately following its commission. The delay that ensued in this litigation and the subsequent economic events peculiar to this libelant should not be to the advantage of the respondent. Had the libelant forthwith made its repairs and a judgment then been rendered, a tort-feasor would not have had the right to expect a judge then to have been clairvoyant and to have foreseen the events that later occurred so as to say that the repairs should not have been made. I do not think that the affirmance of the condemnation judgment which finally took from the libelant its dock should be considered an event relieving the tort-feasor of its liability to libelant in damages. The decision of whether repairs would have been practicable should be made on the basis of the situation as it existed immediately following the casualty.

■■ Respondent, however contends that in any event the proper measure of damages is the difference in the value of the boats between what they were worth prior to the casualty and what they were worth immediately thereafter. There was no direct evidence on this subject. However, it is this Court's opinion that the difference in value, between the value an instant prior to the collision and the value immediately after, was the reasonable cost of repairing. The circumstance that they were not, in fact, repaired does not forbid this Court's adoption of the reasonable cost of repair as the measure of damages.

"Damages in collision cases, where repairs are not made, can be measured either by the estimated cost of repairs at the time immediately following the accident as libelant seeks to do here, or by the diminution in the market value of the vessel. To avoid the influence of market fluctuations and price changes, either of these methods must be accomplished as soon after the collision as is reasonably possible." United States v. Shipowners & Merchants Tugboat Company, D.C., 103 F.Supp. 152, 153, affirmed, 9 Cir., 205 F.2d 352.

"One whose ship is wrongfully injured, as against the wrongdoer, may liquidate his damages by expert testimony alone, and never repair at all." Pennsylvania R. Co. v. Downer, 2 Cir., 11 F.2d 466, at page 467.

■ The Court feels differently about the damage to libelant's dock. It would seem unrealistic for this Court to award damages to the libelant for the damage to the dock. This might appear inconsistent with the views expressed as to repairs to the boats. This Court thinks there is a difference. A judgment of condemnation finding necessity and fixing the amount of damages, had been entered prior to this casualty. The libelant had taken an appeal from such judgment which was pending at the time of this casualty. Libelant's counsel asserts that under Michigan law the title to the dock was still in the libelant company at the time of the occurrence involved, and therefore it should be allowed the reasonable cost of repairing the dock. It is undisputed, however, that there was no deduction from the amount of the condemnation award because of the damage inflicted upon the dock property. No damages should be allowed for the injury to the dock.

■ In view of the foregoing, this Court must now determine what judgment should be given to libelant to represent reasonable costs of repairs to its

boats. Both sides produced witnesses on this subject whose estimates varied widely, from a low of $42,000 for both boats by respondent's witness Harry L. Andrews, to a high of $99,884 by libelant's witness John Heaney. Included in the latter was a figure of approximately $20,000 which represented Heaney's estimate of the cost of repairing or replacing the main shaft of the Steamer Western States. Heaney did not support his assumption of damages to such main shaft with proof that the Court can accept, and no other witness called by either party agreed with his testimony in this regard. No allowance can be made for such item. The witnesses as to cost of repairs had varying interests and motivations which should be considered in evaluating their testimony. They all claimed to be eminently qualified as marine surveyors. The parties have not attempted to explain the wide disagreement disclosed by their respective estimates. Cross-examination did little to expose such glaring errors in their methods or conclusions so as to enable the Court to add something to the estimate of one and take something from another, thus to arrive at an intelligent compromise between them. The Court, therefore, must adopt the testimony of that witness whose evidence he believes to be the most reliable. Employing traditional methods for testing the credibility of witnesses and the weight of their testimony this Court adopts and believes the testimony of libelant's witness Harlow B. Meno, as containing the most reliable estimate of the cost of repairing the two boats. He was thoroughly qualified by experience. He made the most careful examination of the boats in question, spending days thereon where others spent hours. He had no motive for over-estimating the cost of repairs. He was employed to make his survey by the Salvage Association of London, which represented the insurance underwriters of the damaged boats. The reliability of his testimony is enhanced by the fact that the underwriters actually paid the sum of $80,000 to adjust the loss, undoubtedly on the basis of Meno's survey. He estimated the cost of repairs to the Western States at $65,000 and to the City of Detroit III at $15,000. He testified that to make the repairs in question it would have been necessary to move these boats to a shipyard and estimated the cost of such operation at $3,000 for each ship. His total estimate, then, for the expense of making the repairs to the two boats amounts to a total figure of $86,000. In addition to the foregoing, it was conceded by the respondent that libelant is entitled to recover $493.05 for miscellaneous labor involved in re-mooring the boats after the collision; $415 paid to Captain McCrea for supervising this work, and $1,550 paid to Heaney and Associates for their survey. These items total $2,458.05. It is, accordingly, this Court's opinion and order that libelant should recover from respondent the total sum of $88,458.05.

■ Both sides agree that allowance of interest on the above amount is discretionary with the Court. Under all of the circumstances of this case, with the wide variance in estimates and the sharp disagreement as to the proper measure of damages, all of which had to be resolved by a court after trial, this Court does not feel there should be any allowance of interest prior to judgment.

Judgment may be prepared by libelant in accordance with this Opinion and presented for signature.