Petition of SOUTHERN TRANSPORTATION COMPANY, Incorporated, as Owner of the TUG FALCON, for exoneration from or limitation of liability.

Petition of HAMPTON ROADS CARRIERS, INC., as Charterer and/or Contract Purchaser of BARGE BA–1401, for exoneration from or limitation of liability.

Nos. 8024, 8029.

United States District Court
E. D. Virginia,
Norfolk Division.

Jan. 2, 1963.

---

Robert M. Hughes, III, and Francis N. Crenshaw, Norfolk, Va., for Allied Chemical.

William C. Coupland, Norfolk, Va., for Southern Transportation Co., and for Hampton Roads Carriers, Inc.

WALTER E. HOFFMAN, Chief Judge.

On November 11, 1958, the barge BA–1401 laden with 1411 tons of sodium sulphate, sometimes referred to as salt cake, sank in the Chesapeake Bay near the mouth of the Potomac River. At the time and place in question the barge was in tow of the tug Falcon, the latter being owned by the petitioner, Southern Transportation Company, Incorporated. As a result of the sinking the cargo was lost and the barge became a constructive total loss.

The petitioner, Hampton Roads Carriers, Inc., was a contract purchaser of the barge BA–1401 and, for the purpose of this proceeding, may be considered as an owner *pro hac vice*.

The principal controversy lies between the barge owner, Hampton Roads Carriers, Inc., and the cargo claimant, Allied Chemical Corporation. The evidence is insufficient to establish any fault on the part of the tug Falcon and, therefore, Southern Transportation Company, Incorporated, is entitled to a decree exonerating it from liability. As the barge sank under sea and wind conditions which were not unusual, the carrier is

presumptively at fault unless the barge was improperly loaded by the owner of the cargo. With these preliminary remarks the Court makes the following

### FINDINGS OF FACT

1. The petitioner, Hampton Roads Carriers, Inc., hereinafter called "Carriers," signed a charter party with Allied Chemical and Dye Corporation, now Allied Chemical Corporation, hereinafter referred to as "Allied," dated May 22, 1958, at a time when Carriers did not own a cargo barge or towboat with which to transport cargo.

2. The charter party stated, *inter alia*, that the vessel scheduled for such charter was a cargo barge and suitable towboat, scheduled to load at North Claymont, Delaware, for voyages to Jacksonville, Florida, laden with minimum cargoes of sodium sulphate of 1200 net tons per trip, to be carried at a stated rate, and the owner (Carriers) warranted to exercise due diligence to make the cargo barge and towboat seaworthy before and at the commencement of each voyage. Under the charter party Carriers did not expressly agree to furnish a seaworthy vessel; its obligation being limited to the exercise of due diligence in the premises. There was no agreement between Allied and Southern Transportation Company.

3. During August, 1958, Carriers, acting through Batchelder, its principal officer, purchased in New Orleans an eight year old, steel, open hopper barge, 195 feet long, 35 feet in width, and 11 feet deep, known as BA–1401. It was constructed by Avondale Marine Ways, Westwego, Louisiana, in 1950. The barge was of welded steel construction with a flat bottom, straight sides, and raked bow and stern. It was a single open hopper with raked ends, and towing skegs were fitted port and starboard at the after end. The construction contemplated a watertight compartment between the hopper enclosure and the shell of the barge. This empty space, completely surrounding the hopper enclosure, was divided into six supposedly watertight compartments by the installation of athwartship watertight bulkheads between the hopper enclosure and the shell of the barge at regularly spaced intervals from bow to stern. Access to the void spaces between the hopper enclosure and the shell of the barge was through manholes for each compartment from the main deck. A coaming, extending above the main deck level around the perimeter of the hopper enclosure, brought the hopper above the main deck.

4. When purchased at New Orleans, the barge was afloat and on dry dock. She was inspected afloat by Batchelder of Carriers and by one Jack Faulkner. She was also inspected by representatives of the United States Salvage Association for the purpose of a "trip-in-tow" from New Orleans to Jacksonville and for insurance purposes in providing hull coverage at that time. Faulkner is a barge and tow broker who also does some survey work. He did not testify and, from all appearances, there is every indication that he acted as a broker at the time of sale, and as agent for Carriers at the time of the aforesaid inspection, the report being dated September 11, 1958. The qualifications of Faulkner as a marine surveyor are unknown. As a result of this inspection certain recommendations were made and later found to be satisfactorily carried out. The United States Salvage Association inspection was expressly limited to the "trip-in-tow" from New Orleans to Jacksonville, as evidenced by the fact that the tug Pinta was similarly inspected as the towing vessel, and neither the tug nor barge could enter the Gulf of Mexico unless weather conditions were first approved by a representative of the United States Salvage Association. As a further condition, the inspection report states that it is not to be used in connection with the purchase of any vessel.

5. Carriers, acting through Batchelder, relied upon the inspection report from United States Salvage Association, dated September 11, 1958, in purchasing the barge known as BA–1401 for the

sum of $40,000.00. Underwriters requiring the inspection provided full hull insurance coverage in the amount of $45,000.00. On September 6, 1958, the Coast Guard issued a certificate of inspection authorizing the barge, *in light condition*, to navigate outside waters from Carrabelle, Florida, to Fort Myers, Florida. The extent of the inspection by representatives of the United States Salvage Association is not established by the evidence and we have only the aforesaid report to consider as of that time.

6. Following repairs made at New Orleans pursuant to the aforesaid inspection report, the barge was taken light to Norfolk, Virginia, where a survey was held on September 30, 1958, at the request of cargo underwriters to determine the barge's general condition and suitability to transport a cargo of salt cake. Once again, we only have the benefit of the report as neither party elected to call the resident surveyor who was readily available. This inspection was attended by Batchelder, as well as the two surveyors representing Allied. The gist of this report is contained within the following conclusion:

> "As far as may be ascertained from a general examination of this barge afloat without removals or opening up to expose parts ordinarily concealed, and without taking borings to ascertain thickness of structural members, or testing for tightness, it is the opinion of the undersigned that the hull and equipment will be in satisfactory condition for operation, if and when, the foregoing recommendations are completed as projected."

The recommendations were, according to the evidence, carried out.

7. The barge then proceeded to North Claymont, Delaware, for her initial cargo under the charter agreement. Allied expressed dissatisfaction with the tarpaulin and found that the barge had water in the hold. The water boiled up into the open hopper through a number of small holes and through one hole as large as a silver dollar. The barge was thereafter taken to the RTC Shipyard at Camden, New Jersey, but was not hauled out of the water and no condition survey was made. The supports for the tarpaulin were re-arranged and doublers were installed as suggested by the shipyard.

8. The barge was returned to North Claymont where she took on a cargo of 879 tons of sodium sulphate and carried the same safely to Jacksonville. On her return trip she left Jacksonville light and stopped at Brunswick, Georgia, where she picked up 900 tons of bale paper. The bales were loaded by a shifting crane, apparently by starting at one end and proceeding to the other, but leaving space on the bow and stern for 300 tons of roll paper at Savannah, Georgia, which cargo was thereafter loaded in the same manner. There were two minor groundings and she tied up at Allied's dock at noon on November 7, 1958. Other than the minor groundings mentioned above, the evidence does not reflect that the barge was underway at any time other than during moderate weather and sea conditions; the barge having been put into safe refuge in advance of heavy seas or other adverse conditions.

9. Allied commenced loading the barge for the second trip at 4:40 P.M. on November 7 and completed this operation at 6 A.M. on November 8. In order to visualize the loading method adopted by Allied, the open hopper will be divided into four imaginary holds of equal size numbered from forward to aft as 1, 2, 3 and 4. The sequence of loading was 2, 1, 3 and 4. As the dock crane was in a fixed position, the barge was turned end for end after the #1 hold was loaded in order to load holds #3 and 4. Thus the barge would be essentially fully loaded at one end before being turned around to be fully loaded at the opposite end. The method and manner of loading and unloading the salt cake was the sole responsibility of Allied. Carriers' only obligation was to have the tug master check as to the security of the cargo covers put on by Allied and, during load-

ing, to shift or rotate the barge as requested by Allied.

10. As a preliminary to loading the barge, Allied caused the salt cake to be transported in dump trucks from storage bins to a wooden pad at the end of the pier. A crane affixed to the pier took buckets of salt cake and swung them laterally to a position over the open hopper. After a pile had been loaded at the imaginary #2 hold, the barge was shifted inshore and another pile was loaded into the imaginary #1 hold. After this process was completed the barge was turned end for end and the imaginary #3 and #4 holds were loaded in the order named. According to the log memorandum it appears that there was a final turning of the barge (in addition to an earlier turning at approximately 10 P.M.) at 4 A.M. for the purpose of putting four loads (about 11 tons each) thereon. ·

11. The total cargo loaded on November 7–8 was 1411 tons. Batchelder, who was present during a portion of the loading operations for the initial voyage, specifically stated that the barge was capable of carrying 1400 tons. In fact, he had complained about the small quantity carried on the initial voyage which was appreciably less than 1200 tons as agreed by the parties.

12. The barge departed North Claymont at 9:15 A.M. on November 8, 1958, in tow of the tug Falcon on a 50 foot hawser. The flotilla tied up at Tolchester Beach at 11:55 P.M. that night as the weather was getting rough. Remaining there until 6:30 A.M. on November 9, the flotilla proceeded out into the Chesapeake Bay where a 600 foot hawser was placed on the tow. That afternoon, shortly after 3 P.M., an adverse weather report caused the tug master to pull into the Patuxent River and anchor. Prior to entering the Patuxent River the winds were from 12 to 15 miles per hour, with waves of 2 to 3 feet measured from crest to valley. The tug and tow remained in Patuxent River until 7:15 A.M. on November 11, and then proceeded southerly on the voyage with the tow made up on the 600 feet of hawser with cable bridles. The flotilla passed Point No Point at 10:10 A.M. and entered the waters of the Potomac River a few minutes after noon with no unusual sea or wind conditions then prevailing.

13. At approximately 12:35 P.M. on November 11 it was reported that the barge appeared to be sinking. Only a few minutes prior thereto the trim of the barge appeared to be the same as when she left North Claymont. The tug attempted to pull the barge to shoal water but, after it became apparent that she was sinking and the hawser was cut, she rolled over from starboard to port, dumping her cargo and turning end for end. She finally refloated and rested on her port side; thereafter she began to sink by the stern and after a short period of time only about eight feet of the starboard bow remained above water. The towing hawser had been cut to protect the tug and crew just prior to the barge's capsizing. At about 10:30 P.M. the bow disappeared. The tug remained in the area until the arrival of the Coast Guard.

14. Following the disaster the barge was surveyed in her sunken condition in order to ascertain the nature and extent of damages and the propriety of salvage. Steps were taken to raise the barge on a "no cure—no pay" basis, subject to certain conditions not here pertinent. Salvage operations during early January, 1959, were unsuccessful. The barge was finally raised during the latter part of January. Some 15 or 20 efforts were made to raise the barge from the bottom and, understandably, additional damage to the barge was occasioned during these operations.

15. The barge was finally surveyed on June 29, 30 and July 1, 1959, with the tug, barge and cargo interests represented. She was then on the marine railway at Old Dominion Shipyard at Norfolk. This damage survey revealed several fractures of the hull, indentations on the bottom, a severe fracture in the vicinity of the #4 tank and an extensive "dishing in" along the port side of the

barge. The evidence supports the view that the fracture in the way of the #4 tank was caused by a defective weld which was not observable from the bottom of the barge but could have been noted visually from above. True, the specific time of the fracture was not susceptible of ascertainment. There was evidence of thin plating on the barge, doublers and sheared plug welds. The bottom of the barge revealed four heavy "arches", two each within the one-third length from either end, extending for nearly the full width, together with several fractures in the way of three of these arches. Carriers contends that these "arches" or transverse buckling were the result of improper loading by Allied thus causing undue longitudinal stresses.

16. Allied concedes that it cannot pinpoint the exact cause of sinking. It suggests that the sinking was caused by water entering the fracture in the way of the #4 tank and thereafter entering the after peak tank. There would have to be a defective bulkhead to permit water to enter the after peak tank and, while there is no affirmative evidence of such defective bulkhead, it is not unlikely that this was the major cause of the sinking when all proper inferences from the testimony are considered.

17. Divers made an underwater inspection of the barge on November 12, 1958, but this report is inconclusive except for the condition of the port side of the barge. According to the divers' report "the entire portside was reported set in to a maximum depth of two (2') feet between the main deck and the bottom of the barge." This is explained as being attributable to the overturning of the barge, with the barge collapsing on the outside due to the pressure of water underneath it and the pressure proceeding inward on the side of the hopper casing by reason of the additional load when the cargo shifted.

18. The experts are in substantial agreement that the loading operations under the direction and control of Allied did not impose stress or strain conditions which reached the "yield point of metal;" this point being defined as the point at which metal will elongate or stretch or, if curved, at the point at which metal would not come back to its original shape. While petitioners' expert, Miller, did state that the stress analysis of the loading conditions reached a point at which it "could" be considered "serious" and "could eventually" result in the sinking of the barge, such evidence, together with other testimony, is insufficient to establish that Allied improperly loaded the barge or otherwise conducted loading operations in an improper manner. All calculations point to the fact that the metal was not stressed to the "elastic limit," i. e., the point to which one can go without a fracture.

19. The existence of doublers in the form of plates welded on top of other plating for reinforcement, or over a weak area, creates a condition that will normally arouse the suspicions of a competent surveyor that the plating is thin and this fact, on an average purchase survey, would give rise to a closer inspection than is ordinarily made on a trip-in-tow survey, damage survey, or a survey merely for insurance purposes. The Court finds that, in the language of a competent marine surveyor, a more comprehensive examination is made for the purpose of the purchase of the vessel than when the vessel is surveyed for a trip-in-tow or for hull insurance.

20. The barge BA–1401 was in fact unseaworthy at the commencement of her voyage from North Claymont, Delaware, on November 8, 1958, and Carriers, in relying upon the two surveys previously made, failed to exercise due diligence to make the barge seaworthy.

21. The cargo was a total loss. It was owned by Allied Chemical Corporation, formerly Allied Chemical and Dye Corporation, and was worth $48,466.34 according to Allied's invoice to St. Regis Paper Company. If any adjustment is to be made by reason of freight charges, the same may be revised in the final decree.

946

## CONCLUSIONS OF LAW

(a) The petitioner, Carriers, is liable for the resulting loss of cargo. A decree must follow unless petitioner is entitled to limit liability and, on this issue, the burden rests upon Carriers. Metropolitan Coal Co. v. Howard, 2 Cir., 155 F.2d 780, 783; Gilmore & Black, The Law of Admiralty, p. 695, et seq.

 (b) While the petitioner is not chargeable with "privity or knowledge" or with "design or neglect" when it has used due diligence to furnish a seaworthy barge, the petitioner in this case failed in its duty in that it relied upon surveys which were for limited purposes and which facts were known, or should have been known, to the petitioner. The Abbazia, D. C., 127 F. 495; Frederick Snare Corp. v. Moran Towing & Transp. Co., D. C., 195 F.Supp. 639. The diligence required is diligence with respect to the vessel, not in obtaining certificates of seaworthiness from surveyors. Bank Line v. Porter, 4 Cir., 25 F.2d 843, 845.

 (c) If there is doubt as to the seaworthiness of the barge, that doubt must be resolved against the owner of the barge and in favor of the shipper. The Southwark, 191 U.S. 1, 24 S.Ct. 1, 48 L. Ed. 65; Bank Line v. Porter, supra.

(d) There is no evidence as to the prior history of the barge before its purchase at New Orleans other than the date and place of construction; nor is there evidence that the petitioner endeavored to secure such history before purchasing the barge.

 (e) Fault of the tug Falcon has not been established and the petitioner, Southern Transportation Company, Inc., is entitled to a decree exonerating it from liability.

(f) No improper loading of the barge having been established by credible evidence, the counterclaim of Carriers must fail.

 (g) The case of Commercial Molasses Corporation v. New York Tank Barge Corporation, 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed. 89, while containing sound principles of law as to the presumptions and burdens in an unexplained sinking of a barge, is not controlling under the facts of the instant case. The inferences to be drawn from this record properly suggest that the barge BA–1401 was unseaworthy.

(h) Allied Chemical Corporation is entitled to a decree against the petitioner, Hampton Roads Carriers, Inc., in the sum of $48,466.34, plus interest and taxable costs, subject to adjustment, if any, for freight charges.