Latham B. HEWLETT, Libelant,

v.

TUG EVELYN, her engines, etc., in rem, and C. G. Willis Co., Inc., in personam, Respondents.

No. 8260.

United States District Court
E. D. Virginia,
Norfolk Division.

May 8, 1968.

Morris H. Fine, Norfolk, Va., for libelant.

Robert M. Hughes, III, Norfolk, Va., for respondents.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

This is a related case to Petition of Southern Transportation Company, 211 F.Supp. 940 (E.D.Va., 1963), affirmed in part and reversed in part, sub nom. Hampton Roads Carriers, Inc. v. Allied Chemical Corp., 329 F.2d 387 (4 Cir., 1964). The facts pertaining to the sinking of the barge BA–1401 are sufficiently detailed in these opinions and will not be repeated. The present facts start with the BA–1401 resting on the bottom of the Chesapeake Bay.

The barge was built in Louisiana in 1950. Hampton Roads Carriers purchased the barge in 1958 for the sum of $40,000.00. Underwriters requiring an inspection survey, dated September 11, 1958, provided full hull coverage in the amount of $45,000.00. The barge sank on November 11, 1958. On the following day divers made an underwater inspection of the barge, but their report was inconclusive other than as to the condition of the port side. Later Hewlett, the libelant, was awarded a salvage bid in the sum of $21,750.00 on a no cure-no pay basis to raise the barge.

The salvage agreement further provided that if the cost of salvage and the cost of repairs exceeded the insured value[1] of the barge, then the barge would be awarded to Hewlett in lieu of the sum of $21,750.00.

Early salvage operations were unsuccessful. In fact, it required some 15 to 20 efforts before the barge was finally raised. During the course of these attempts it is apparent that additional damage to the barge was sustained. After the barge was raised, a complete marine survey was made during late June and early July, 1959. This survey revealed several fractures of the hull, indentations on the bottom, a severe fracture in the vicinity of the No. 4 tank, and an extensive "dishing in" along the port side of the barge. Based on the survey information and personal inspection, three Norfolk area shipyards submitted bids on the cost of restoring the barge to its condition immediately prior to the sinking; the lowest bid being from Old Dominion Marine Railway Corporation in the sum of $46,290.00.[2]

Since the lowest bid exceeded the insured value of the barge, libelant took possession of and title to the barge pursuant to the terms of his salvage contract. He caused temporary repairs to be performed for the purpose of stopping the leaks, upon the completion of which the barge no longer leaked.[3] These temporary repairs aggregated $1,305.76, and apparently the submitted bids did not take these temporary repairs into consideration.

Subsequently, libelant used the BA–1401 in the salvage operations of the DIXIE QUEEN. This was the only use of the barge between the time it sank in November, 1958, and the collision giving rise to the present controversy which took place on September 28, 1960. No repairs, other than the temporary repairs indicated above, had been performed in the interim period.

On September 28, 1960, the barge was moored at Old Dominion Shipyard when it was struck by the barge BERTIE, then being pushed by the tug EVELYN. The contact caused no break in the hull of the BA–1401, but did place a dent in the starboard side. Libelant concedes that this dent affected only the outer shell of the barge, and did not injure the hopper. Libelant filed this action on January 22, 1962, seeking the recovery

1. The insured value was $45,000.00.

2. Other bids received were:
   Norfolk Shipbuilding and Drydock Corporation—$62,100.00.
   Colonna Shipyard, Inc.—$65,125.00.

3. After the completion of the temporary repairs, the barge could be used for carrying piling or logs since this product could be allowed to get wet. There is no evidence, however, that the barge was used for this purpose.

of the cost of repairs to restore the starboard side of the barge to as good condition as existed immediately prior to contact with the BERTIE. He admits that the collision with the BERTIE did not affect either the seaworthiness of the barge or its cargo carrying capacity, but nevertheless contends that the barge was of greater value than the cost of repairs and, hence, is entitled to recover these costs. On the other hand the respondents, admitting fault as to the collision between the BERTIE and BA–1401, urge that the barge was a constructive total loss and that no real or actual damages have been shown, thus restricting the recovery to nominal damages.

■ Where repairs are practicable and the damaged vessel is not a total loss, restitution by way of the cost of repairs is the general rule of damages. This is true even though the repairs are not made if, in fact, the value of the vessel is thereby decreased. Streckfus Steamboat Line v. United States, 27 F.2d 251 (5 Cir., 1928). Where, however, the vessel is a total loss, the measure of damages is the value of the vessel at the time of the collision, less any value of the wreck as salvage, O'Brien Bros. v. The Helen B. Moran, 160 F.2d 502 (2 Cir., 1947). We find no precedent for allowing damages where a vessel, deemed a constructive total loss, suffers still further damage. Generally speaking, in admiralty, the award of damages rests in the sound discretion of the court, and the giving or withholding of damages is predicated upon enlarged principles of equity and justice. 48 Am.Jur., Shipping, § 540, p. 367 (1943).

■ In determining whether the barge was a constructive total loss as of September 28, 1960, when the BERTIE made contact with her starboard side, we should apply the principles set forth by Judge Augustus N. Hand, with Judges Learned Hand and Chase concurring, in the O'Brien Bros. case, supra. The actual cost of repair may establish a prima facie case, but when the value of the barge is shown to be less than the cost of repair, the burden then rests upon the libelant to establish the value by (a) capitalization of earning capacity, (b) the cost of a barge of a similar type in the open market, or (c) the cost of constructing a new barge if that is feasible. In each instance there must be a deduction of proper depreciation due to the age and deterioration of the vessel. The least of these alternatives would furnish the measure of recovery because of the duty of the injured party to minimize damages. Applying any possible alternative, it is abundantly clear that the BA–1401 was a constructive total loss on September 28, 1960, prior to the BERTIE striking it.

■■ In general, "the worth of the thing is the price it will bring"—the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. Standard Oil Co. of New Jersey v. Southern Pacific Co., 268 U.S. 146, 155, 45 S.Ct. 465, 69 L.Ed. 890 (1925); The Nyland, 164 F.Supp. 741, 743 (D.Md., 1958); The I. C. White, 295 F. 593, 595 (4 Cir., 1924). Manifestly, the BA–1401 would have brought nothing but scrap value prior to the collision of September 28, 1960. The libelant still retains that value and it has not been diminished by the impact in question. Whether we accept a valuation of $40,000.00 (purchase price in 1958) or the full insurance value of $45,000.00 as of the time of acquisition by Hampton Roads Carriers, and whether we charge any depreciation for its use prior to its sinking on November 11, 1958, the lowest bid for repairing the barge exceeded either valuation. Nor do we believe that the making of temporary repairs aggregating $1305.76 in any way removes the BA–1401 from the category of a constructive total loss.

Finding that the BA–1401 was a constructive total loss prior to the additional damage sustained on September 28, 1960, we feel that the controlling principle is as stated by Chief Justice Pound in the New York Court of Appeals (cited with

approval in O'Brien Bros. v. The Helen B. Moran, supra), where it is said:

> " * * * (T)he cost of repairs must be less than the diminution in market value due to the injury, and, secondly, that the repairs must never exceed the value of the automobile itself as it was before the injury. *The plaintiff should not benefit by the loss.*" (emphasis supplied).

 In his brief, the libelant admits that probably no willing buyer could be found for the barge. Its salvage value remains unchanged; its cargo carrying capacity is the same; it will still float. To make an award of damages would unjustly enrich the libelant. The situation is akin to that arising in the Petition of Socony Vacuum Transp. Co., 93 F.Supp. 718 (S.D.N.Y., 1950), where THE EMPIRE GARRICK struck the CHOAPA which had previously been dealt a fatal blow by THE VOCO, and the court dismissed the libel filed by THE CHOAPA against THE EMPIRE GARRICK. It is simply a case of nominal damages for violation of a duty with no compensable damages resulting therefrom.

Certainly the repairs to the starboard side of the barge were not practicable in this case. Whether the repairs are practicable depends on whether the libelant would have any reasonable justification for going ahead with the repairs, Detroit & Cleveland Nav. Co. v. The Elbert H. Gary, 161 F.Supp. 570 (E. D.Mich., 1958). Manifestly, the repairs in the instant case were not practicable.[4] The barge's market value and utility value have not been diminished. Indeed, the overwhelming weight of the evidence is to the effect that it would be foolish to make the repairs to the starboard side without also doing the repairs caused by the 1958 sinking. It is not substantially contradicted that, before using the barge for grain-carrying purposes, the major repairs would have to be effected.

Because the respondents initially denied any breach of duty and improper navigation, the libelant is entitled to the sum of $1.00 by way of nominal damages together with his costs in this court. The sum of $1.00 was heretofore tendered on October 11, 1962.

Proctor for respondents will prepare an appropriate decree.

---

4. Note the words of Judge Addison Brown, a recognized authority in the field of admiralty, in The J. T. Easton, 24 F. 95 (S.D.N.Y.1885), in dealing with the ascertainment of damages where repairs are not made for long periods of time.