472 F.Supp. 556 (1979)
UNITED STATES of America, Plaintiff,
v.
MOTOR VESSEL GOPHER STATE, her engines, tackle, etc., in rem, and Midwest Towing, Inc., in personam, Defendants.
No. 77-686A(2).
United States District Court, E. D. Missouri, E. D.
March 29, 1979.
*557 Bruce D. White, Asst. U. S. Atty., St. Louis, Mo., for plaintiff.
Gary T. Sacks, Goldstein & Price, St. Louis, Mo., for defendants.

MEMORANDUM
WANGELIN, District Judge.
The above captioned case is an action by the United States to recover damages caused by defendants when the M/V Gopher State with a number of barges in tow made contact with and damaged a United States government lock and dam. The action is brought pursuant to 33 U.S.C. § 408, The Rivers and Harbors Act of 1899. Following a bench trial held on April 17, 1978, and after fully considering the evidence and the applicable law, this Court makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. At all material times defendant Midwest Towing, Inc. was a corporation which owned and operated the M/V Gopher State, a diesel powered river towboat of 4300 horsepower official number 560090 located within this district.
2. Plaintiff is a sovereign nation and was at all material times the owner of Mississippi River Lock and Dam 25 located at Winfield, Missouri, and which was a work within the meaning of § 14 of The Rivers and Harbors Act of 1899, 33 U.S.C. § 408.
3. On the morning of June 30, 1975 the M/V Gopher State with a number of barges in tow made contact with and damaged the upper miter gates of Lock No. 25.
4. The contact and resulting damages were not caused by or due to intentional acts of defendants or their gross negligence.
5. The damage to the lock gates was surveyed on July 1st and 4th, 1975 and September 18, 1975 on behalf of defendants by Marine Surveyor, G. Dudley Yeomans of Merrill Marine Services, Inc. to ascertain the nature and extent of damages sustained by the gates. Mr. Yeomans' report contained in the record as defendants' Exhibit B estimated from the nature and extent of the damages sustained the total cost of repair to be Ninety Nine Thousand Nine Hundred Fifty Nine Dollars and Sixty One Cents ($99,959.61).
6. The surveys and reports performed by Mr. Yeomans were made in conjunction with personnel of the United States Corps of Army Engineers who confirmed the damages reflected in the aforesaid survey report.
7. Larry Wright, a Civil Engineer for the United States Corps of Army Engineers, concurred in surveyor Yeomans' report.
8. Pursuant to regulation and custom the United States Corps of Army Engineers prepared a formal, detailed and itemized estimate of the cost of repairing the damaged gates. The formal estimate was fully integrated and was prepared on Engineering Form 3013 which has been introduced into evidence and which reflects a total estimated cost of repairs of Ninety One Thousand Six Hundred Sixty Eight Dollars ($91,668.00) plus an overhead charge of Eight Thousand Two Hundred Ninety One Dollars and Sixty One Cents ($8,291.61) for a grand total of Ninety Nine Thousand Nine Hundred Fifty Nine Dollars and Sixty One Cents ($99,959.61).
*558 9. The formal estimate was based upon experience of the Corps of Engineers in repairing similar damage.
10. Subsequent to the rendering of the estimate in the amount of Ninety Nine Thousand Nine Hundred Fifty Nine Dollars and Sixty One Cents ($99,959.61) including overhead, one of the damaged gates was repaired and a final bill in the amount of One Hundred Fifty Seven Thousand Four Hundred Two Dollars and Fifteen Cents ($157,402.15) was submitted.
11. A comparison of the estimates with the final invoice reflects a major disparity between the amount estimated for several items and the amount claimed for those items.
(A) Off site labor hours were originally estimated at thirty six hundred (3600) labor hours. The final invoice would charge defendant with fifty four hundred and nine (5409) hours of labor an increase of sixty six per cent (66%) over the amount estimated. The cost of off site labor has accordingly been adjusted upward from Forty Two Thousand Four Hundred and Eight Dollars ($42,408) to Eighty Thousand Two Hundred and Twenty Four Dollars and Twenty One Cents ($80,224.21).
(B) The amount of overhead estimated was Eight Thousand Two Hundred Ninety One Dollars and Sixty One Cents ($8,291.61). An analysis of the final invoice yields the conclusion that Fifty Three Thousand Four Hundred and Twenty One Dollars and Thirty Two Cents ($53,421.32) is the amount of overhead actually billed.
(C) In what the Court can only consider as an unreasonable and highly excessive method of charging overhead, the government has made a general charge of district overhead in the amount of Twenty Thousand Five Hundred Ninety One Dollars and Forty One Cents ($20,591.41) in connection with the repairs to the number 4 miter gate. The items which constituted the cost of repairs (labor, materials, vehicle rental, reproduction, plant and equipment and personnel travel) were totalled. The total, One Hundred Twenty Five Thousand Five Hundred Sixty Three Dollars and Eighty Cents ($125,563.80), included overhead already charged to the various items in the amount of Thirty Two Thousand Five Hundred Twenty Four Dollars and Ninety Nine Cents ($32,524.99). The government then took sixteen point four per cent (16.4%) of the cost of repairs already including overhead or Twenty Thousand Five Hundred Ninety One Dollars and Forty One Cents ($20,591.41) as an additional overhead charge. This latter amount is arbitrary and also constitutes overhead being charged on overhead. There has been no proof that this general overhead figure is either necessary or reasonable or that it would not have existed regardless of the accident. Since it is computed on a dollar figure which already contains overhead charges it is unreasonable on its face.
12. The overhead charges were not based upon actual expenditures of overhead items related to the accident but were calculated under regulations promulgated by the Corps of Engineers and determined by the staff of the St. Louis District Corps of Engineers.
13. The government did not solicit bids from any private contractors to determine the amount they would have charged to repair the damaged gates. But instead, the Corps effectuated the repairs with its own labor and equipment based upon its belief that the costs would not exceed the amount set forth in its own detailed and itemized estimate of Ninety Nine Thousand Nine Hundred Fifty Nine Dollars and Sixty One Cents ($99,959.61).
14. From the testimony adduced at trial, the fair and reasonable costs of repairing the damage caused by defendants did not exceed the sum of One Hundred Thousand Dollars ($100,000). The Court finds that the repairs could have been effectuated by a private contractor for an amount not in excess of One Hundred Thousand Dollars ($100,000). Accordingly, the Court finds the amount charged, One Hundred Fifty *559 Seven Thousand Four Hundred Two Dollars and Fifteen Cents ($157,402.15) is excessive and unreasonable.
15. For the purpose of awarding costs only, the Court, pursuant to Rule 68 of the Federal Rules of Civil Procedure, notes that defendants filed a formal offer of judgment simultaneously with the filing of their answer in the amount of One Hundred Two Thousand Five Hundred Dollars ($102,500).

Conclusions of Law
This Court has jurisdiction over the parties and over the subject matter pursuant to the Court's admiralty and maritime jurisdiction, 28 U.S.C. § 1333. The Rivers and Harbors Act of 1899, 33 U.S.C. § 408, confers strict liability upon those who cause damages to a government work irrespective of fault. Defendants concede and have never contested liability. Defendants do, however, dispute the amount of damages plaintiff claims are attributable to the casualty. The burden is upon the plaintiff to prove that the amount claimed to repair the damages is fair and reasonably related to actual damages incurred. The government is entitled to have its lock facility restored to the condition in which it was prior to the collision but no more. The Baltimore, 75 U.S. 377, 8 Wall. 377, 19 L.Ed. 463 (1869); Zeller Marine Corp. v. Nessa Corp., 166 F.2d 32 (2nd Cir. 1948); Anthony O'Boyle, Inc. v. The Tug Robinhood, 134 F.Supp. 271 (E.D.N.Y.1955); McCormick, The Law of Damages, pp. 470, 471. As stated by the Court in The Cape Friendship, 100 F.Supp. 856, 860 (Md. Admiralty Div. 1951):
Of course the burden of proving damage in all cases rests upon the party claiming to have sustained them and it is the duty of the shipowner to take all reasonable actions to minimize the damages. ibid.

In addition, admiralty law provides that the granting or withholding of damages rests with the discretion of the admiralty judge who is entitled to rest his decision upon principles of equity and justice. Hewitt v. Tug Evelyn, 283 F.Supp. 917, 919 (E.D.Va. 1968):
Generally speaking, in admiralty, the award of damages rests in the sound discretion of the court, and the giving or withholding of damages is predicated upon in large principles of equity and justice. ibid.

The Court finds plaintiff has failed to meet its burden of proving that the sum of One Hundred Fifty Seven Thousand Four Hundred Two Dollars and Fifteen Cents ($157,402.15) constitutes a fair and reasonable charge for the repairs to the damaged lock gates. The Court finds that the government has simply failed to prove the additional amount claimed over and above the government's own detailed and itemized estimate of the costs necessary to repair the damage to the lock facility was necessary, fair and reasonable. Although the government did not attempt to obtain bids from private contractors, it did, based upon its own experience in repairing similar type damages, prepare the aforesaid formal estimate of the costs of repairs. The Court finds this estimate analogous to a bid for repairs submitted by a private contractor. See Monsanto Co. v. Port of St. Louis Investments, Inc., 350 F.Supp. 502 (E.D.Mo. 1972). The Court credits the testimony of defendants' experts to the effect that the fair and reasonable costs necessary to restore the damaged facility to its condition prior to the casualty did not exceed One Hundred Thousand Dollars ($100,000) and that private contracting firms could have effectuated the repairs for no more than that amount. The Court finds that the amount of overhead demanded by the government is an unreasonable amount and is not factually related to the actual repair work performed. Since each of the items in the costs of repair already included specific overhead charges, the general overhead charge for general district overhead is nothing more than overhead on overhead for which the law does not permit recovery. The government has not met its burden that the amount claimed for overhead is properly attributable to a specific job of repair. See Canadian Pacific Railway Co. *560 v. United States, 272 F.2d 913 (9th Cir. 1959); Mitsui O. S. K. Lines, K. K. v. Horton & Horton, 480 F.2d 1104 (5th Cir. 1973). The Court finds the fair and reasonable costs of repairing miter gate number 4 does not exceed the sum of One Hundred Thousand Dollars ($100,000) and as stated above the Court credits the testimony of defendants' experts in this regard, one of which, Peter C. Merrill, has been used by the government as its expert in proving the reasonable costs of repairing damaged lock gates. The parties have stipulated that the reasonable costs of repairing upper miter gate number 2 is Two Thousand Four Hundred Twenty Dollars ($2,420).
33 U.S.C. § 411 requires this Court to award plaintiff a penalty of not more than Twenty Five Hundred ($2,500) nor less than Five Hundred Dollars ($500). The amount to be awarded lies within the discretion of this Court. The parties have stipulated that the damage to the facility was not the result of gross negligence or an intent to injure the gate. The damage did, however, take the better part of four months to repair while the lock operated within an unsatisfactory temporary gate. The Court finds that a penalty of One Thousand Dollars ($1,000) is reasonable.
Plaintiff has also asked for an award of pre-judgment interest, which is customarily awarded in admiralty cases unless exceptional or peculiar circumstances are present. Mid-America Transportation Co., Inc. v. Rose Barge Lines, Inc., 477 F.2d 914 (8th Cir. 1973); Sinclair Refining Co. v. S. S. Green Island, 426 F.2d 260 (5th Cir. 1970). In this case, although the amount of damages claimed is in excess of the amount awarded by this Court, the Court finds that plaintiff is entitled to receive pre-judgment interest at the rate of six per cent (6%) pursuant to § 407.020 RSMo 1969.
Based upon the foregoing, judgment will be entered in favor of the government and against defendants in the amount of One Hundred Three Thousand Four Hundred Twenty Dollars ($103,420.00), constituting the stipulated amount for the damages to the number 2 miter gate in the amount of Two Thousand Four Hundred Twenty Dollars ($2,420), and One Hundred Thousand Dollars ($100,000) for the fair and reasonable costs of repairing the number 4 miter gate with allowance of pre-judgment interest. Further, a penalty of One Thousand Dollars ($1,000) will be assessed against defendants. Since the judgment obtained by the plaintiff is more favorable than the offer of judgment filed by defendants, the Court cannot award defendants their costs incurred since the filing of the offer of judgment.