**GEORGE'S RADIO AND TELEVISION COMPANY, INC., Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

Civ. A. No. J–80–1392.

United States District Court, D. Maryland.

Sept. 28, 1982.

---

John T. Ward, Jonathan A. Chase, Baltimore, Md., for plaintiff.

J. Paul Mullen, H. John Bremermann, III, Baltimore, Md., for defendant.

## MEMORANDUM AND ORDER

SHIRLEY B. JONES, District Judge.

An opinion was entered in this case deciding the amount of damages to which plaintiff was entitled[1] on April 14, 1982, and plaintiff filed a timely motion to amend the findings and judgment. Defendant filed an opposition, and oral argument was heard on June 16, 1982.

The background of this case is briefly described in the prior opinion and the disputed repair items, together with the testimony concerning them, are set out in some detail. 536 F.Supp. 681 (D.Md.1982). The description will not be repeated here, except in connection with the issues raised on plaintiff's motion to amend.

Plaintiff asks that this Court amend its findings with respect to several disputed items of mechanical repair, Items, 1, 2, 3, 4, 7 and 11 on the Broward Marine invoices (P.Exs. 12–19), which total $32,242.25, $33,-531.94 with tax. The basis for the requested amendment is that this Court erred in concluding, as a matter of law, that by not presenting expert testimony on the "necessity for or scope of the disputed items," 536 F.Supp. at 683, plaintiff failed to sustain its burden of proof of damages. Plaintiff contends that its burden is only to show causation and fairness and reasonableness. Cau-

sation was established by stipulation, and fairness and reasonableness, including scope or extent, was a matter of dispute, upon which the Court should have weighed the testimony of Captain Rudolph Fleck, plaintiff's expert, against that of David Pascoe, defendant's expert. Acceptance of plaintiff's position does not necessarily dictate a finding that it is entitled to recover for all the disputed items, simply that this Court review them in detail, rather than rejecting them out of hand.

The stipulation upon which plaintiff relies (Joint Ex. 1) established causation[2] as to most items, with nothing agreed as to fairness and reasonableness of the charges for the items or as to the scope or extent of repairs necessary. Review of the stipulation and the transcript of the record when the stipulation was introduced indicates, and this is my recollection as well, that defendant agreed with respect to the items listed that the items were damaged as a result of the sinking (and needed some repair), but did not agree that the scope, or extent, of the work done by Broward Marine was necessary or that Broward's charges were fair and reasonable. Some of the charges for specific items were contested, for example, on the basis that replacement of a part was not necessary, the old one could have been washed off and reused.

The questions thus seem to be whether a plaintiff must prove what has been called here "scope and extent" as an element of proof, separate and apart from "causation" and "fairness and reasonableness" and, if not, whether it comes under "causation" or "fairness and reasonableness." In the ordinary case, it is not necessary to analyze the question in these terms, but it is in this instance because plaintiff had to rely on the

1. The question of liability had earlier been resolved in an oral opinion. The parties thereafter collaborated on and submitted a joint schedule of damages in which the disputed items were set out and the basis of the dispute was indicated.

2. This Court's use of the phrase "necessity for" in the prior opinion may give the impression

that plaintiff had not established causation, i.e., that damage to items was due to the sinking of the vessel and not some other cause. That was certainly not intended. Questions of "necessity" were presented, in the sense of necessity of replacing a part rather than reusing it, for example.

non-expert testimony of Captain Fleck[3] and the stipulation to establish the causal connection between the sinking and the damage, but presented Fleck's expert testimony on fairness and reasonableness. The stipulation was entered into somewhat at the Court's prompting, to avoid a lengthy recital by Fleck that he was familiar with the presinking condition of a part, that he saw it after the sinking and it was broken, bent, corroded with saltwater or the like, from which testimony the obvious inference is that the sinking of the vessel caused the damage.

Even if the questions as framed above are not resolved in favor of the plaintiff, the Court may have erred in disallowing the items entirely for lack of expert testimony, because Captain Fleck did testify with respect to some parts that he saw them after the sinking and they were broken. If such testimony is accepted, it hardly takes an expert to conclude that in performing the repairs it was necessary to replace the part.

█ Damage to personal property in tort cases may be measured by the reasonable cost of repairs needed to restore the property to its previous condition, provided the cost does not exceed its fair market value. *E.g., O'Brien Bros. v. The Helen B. Moran*, 160 F.2d 502, 504–05 (2d Cir. 1947). The same measure applies in this maritime insurance claim, since the contractual purpose is the same as the purpose of tort damages, to restore the value of the property to what it was before the loss.

The plaintiff's burden on damages has been stated in various ways in admiralty cases: "to establish that the amount claimed was reasonable and that it fairly reflected the actual costs of repairing the [damaged property]," *United States v. M/V Gopher State*, 614 F.2d 1186, 1187 (8th Cir. 1980); "to prove that the amount claimed to repair the damages is fair and reasonably related to actual damages incurred," *id.*, 472 F.Supp. 556, 559 (E.D.Mo.1979); to prove

"the damages he has actually suffered," *The Helen Moran*, 160 F.2d at 504–05; to prove "the amount, as well as the fact, of damages," *Pizani v. M/V Cotton Blossom*, 669 F.2d 1084, 1088 (5th Cir.1982). All of these formulations include what has been called scope or extent of repairs necessary in this case.

█ Although it is not always specifically stated, the general rule seems to be that a plaintiff can make a *prima facie* case by proving causation (in the general sense) and the actual cost of repairs. *See M/V Cotton Blossom*, 669 F.2d at 1088–89 (lump sum bid including repair items not attributable to collision insufficient); *The Helen B. Moran*, 160 F.2d at 505 (libellant showed what was paid out for repairs); *Hinfin Realty Corp. v. M/V Poling Bros. # 7*, 348 F.Supp. 1391, 1397 (E.D.N.Y.1972) (using itemized bills to calculate damages). Proving "necessary repairs" is still a part of plaintiff's burden, and it may be, in particular cases, that expert testimony is required. Admiralty courts are, however, courts exercising liberal equity powers, not bound by the rigid rules of the common law. *E.g., M/V Cotton Blossom*, 669 F.2d at 1089.

█ Captain Fleck testified that some parts he saw after the sinking were broken, corroded, or the like. A consistent theme of his testimony was that the GEORGEJAN was kept in excellent condition in every respect. In addition, the Broward Marine invoices and backup documents contain, in some instances, information helpful in determining the scope of repairs needed on particular items.

The relevant documents, plaintiff's exhibits 12–19, are progress billings of Broward Marine, Inc., the yard at which the work was performed. Each of the invoices lists separate items of work, described the same throughout, with labor and materials charges shown for work on the item during the period of the progress billing. Attached to the invoices are the backup material req-

---

**3.** This Court ruled at trial that Fleck did not qualify as an expert mechanic or marine surveyor, to enable him to testify as an expert on the extent of repairs needed on certain items.

Plaintiff's counsel candidly admitted at argument on the motion that had he been able to secure the testimony of the boatyard mechanics who performed the repairs he would have.

uisitions or purchase orders for materials used and in a few cases for labor performed on particular days during the period. Each of these backup forms shows the item number on the invoice to which the materials relate, the quantity and name of part, the cost, and the billed price for the item. Adding the billed prices on all the attached material requisition forms for a particular invoice item produces the total charge shown on the invoice for material. In a few instances, the backup documents, particularly at the beginning, contain helpful information. The Sun Power Diesel invoice attached to Ex. 12, for example, states: "Note Bent connecting rod in stbd engine # 4. Right liners pitted with salt corrosion."

Considering Captain Fleck's testimony and the detailed nature of the backup orders and requisitions for the Broward Marine invoices this Court erred in concluding, without further evaluation, that plaintiff had failed to sustain its burden of proving necessary repairs simply because it failed to present expert testimony on the subject. The liberal nature of an admiralty court's powers should be considered in resolving any doubts on this question.

The items disputed at this stage are repairs to the engines (Item 1), generators (Items 2 and 3), bilge pumps (Items 4 and 7), and water pressure system (Item 11). David Pascoe testified for the defendants as an expert marine surveyor. He was permitted to testify as to what repairs to the engines were necessary, although his technical experience was limited. Pascoe did not see the starboard engine completely disassembled, only partly, and he never saw the port engine or the generators disassembled at all. He performed an evaluation at a later time of what repairs were necessary by examining the invoices and backup material.

### Engines and generators

Most of the repair work on the engines and generators was performed by Sun Pow-er Diesel and billed to Broward Marine, which paid Sun Power and billed the work on its invoices. Broward added a markup on labor, materials, and mileage [4] and billed the work, along with its own charges, if any, in its progress billings. The attachments to the invoices in which Sun Power work was billed show the Sun Power charges and the Broward charges. For example, a $14,904.20 charge on Item 1 for the February 19, 1979 Broward invoice (P.Ex. 12) corresponds to Sun Power's January 4, 1979 invoice in the amount of $12,350.00 (P.Ex. 10).

Pascoe prepared a breakdown of the engine and generator repairs based on the Sun Power invoices, showing each part and noting it as approved or not. (D.Exs. 14, 15, 16). His approval of an item indicated that the charge was fair and reasonable and that the item was applicable to engine or generator repair, as noted. If an individual item was unexplained, that is, he could not determine what it was or where it would go, it was disallowed. If he did not believe it should have been necessary to replace the part, the item was disallowed. A labor charge, based on the ration of allowed parts to total parts, was then added. Pascoe made his calculations based only on the Sun Power invoices, so no allowance was made for Broward's markup. Nothing was allowed for mileage.

Pascoe testified that D.Exs. 14, 15 and 16 represented the same kind of calculations for each of the three Sun Power invoices. Addition of Pascoe's figures on the three exhibits produces a total of $16,103, a figure greater than the total allowed for engine and generator repairs, $11,952.08, on the joint schedule of damages. Defendant's exhibit 16, an analysis of Sun Power Invoice No. 4992, contains a notation, "This parts duplicates w/o 4955, Page 3 of 5," and the charges on the invoice were disallowed completely. The total of Pascoe's allowed items

---

**4.** The vessel was taken to Sun Power immediately after the sinking. Some of its work was performed there and some at the Broward yard, after the vessel was moved to Broward around the beginning of February 1979. The Sun Power invoices show mileage at $.30 per mile (P.Ex. 11, and apparently P.Ex. 10) and $.40 per mile (P.Ex. 11A).

on the other two Sun Power invoices (D.Exs. 14 and 15) is $11,952.11 and the total allowed by defendant for engine and generator repairs (Items 1, 2 and 3) is the same.

The identity of the two figures is not coincidental, although the separate totals for engines and for generators in D.Exs. 14 and 15 do not correspond to the respective allowances for these items in D.Ex. 12 and the joint schedule of damages. Using Pascoe's computations on D.Ex. 14, the total allowed for engine work is $1,062.95, the total for generator work is $4,344.62. His allowed charges on D.Ex. 15, all of which are designated engine repair, total $6,544.54. All these items were billed under Item 1 by Broward (P.Exs. 12, 19), although Sun Power's invoice 4955 (P.Ex. 11A), includes both generator and engine repair work. The $1,062.95 figure allotted to Item 2 by defendant is the engine work total shown on D.Ex. 14, and the $10,889.16 allotted to Item 1 is the sum of the D.Ex. 14 figure of $4,344.62 for generator work and the D.Ex. 15 figure of $6,544.54 for engine work. Apparently the designation of items by Pascoe on D.Ex. 14 was simply reversed.

Based on what Pascoe allowed, it can be determined what he disallowed. None of the additions Broward made to the Sun Power invoices were allowed, nor were any of the charges for work performed by Broward employees on engines and generators allowed. Its $1,573.09 charge on Item 3 was completely disallowed,[5] and its own charges on Items 1 and 2, $4,779.18 for labor and materials and $50.00 for towing from Sun Power to Broward, were disallowed. No explanation was given.

Plaintiff introduced an estimate of allowable damages Pascoe had prepared only two weeks before trial (P.Ex. 38), in which allowances were made as follows: Item 1, $15,790.06, Item 2, $5,029.99, Item 3, $1,573.09. The amounts for Items 1 and 2 were fifty percent (50%) of the total Bro-

ward charges, based on Pascoe's belief that the engines and generators were in normal, average condition before the sinking and consequent disallowance of half the charges for betterment. Broward's charge for Item 3 was allowed completely, with the notation "amount appears reasonable." Upon cross-examination Pascoe testified that he had since learned that the engines and generators were in better than average condition before the sinking and that because they had recently been overhauled, it should have taken a lesser amount of money to put them back in good condition. Pascoe had not seen the Sun Power itemized invoices when he prepared the earlier estimate.

I give Pascoe's testimony on engine and generator repairs very little weight. He qualified as an expert marine surveyor, but his knowledge of mechanical repairs was limited. He did not see either engine or either generator completely disassembled. Reconstruction without personal knowledge, as he did with the Sun Power invoices, is an accepted way of proceeding for an expert, but Pascoe's methodology left much to be desired. Some of the deficiencies have been alluded to above. His disallowance of many small items as unnecessary was based on the fact that many marine parts are designed to withstand brief immersion in salt water, although he conceded that many mechanics routinely replace items such as belts and clamps, instead of washing them off and reusing them.

Despite the deficiencies in Pascoe's testimony, however, this Court must determine whether plaintiff met its burden of proof with respect to scope, or reasonable relation of the repairs performed to the actual damage. The testimony of Captain Fleck and documentary evidence established that the engines and generators were in excellent condition before the sinking. The Westerbeke generator was installed new in March 1978, and the Mercedes generator was overhauled at the same time (P.Ex. 7). The

---

5. Some of Sun Power's work on the 30 kw Mercedes generator, Item 3, was included in invoice 4955, some of which was allowed by Pascoe.

engines were overhauled in November 1978. (P.Ex. 8).

Captain Fleck, who actually saw the condition of the engines and generators after the vessel was raised and as work was being performed at Sun Power, supplied considerable detail. Testifying with Sun Power invoice 4955 (P.Ex. 11A), he described the condition of major parts. The major items not allowed by Pascoe (see D.Ex. 14) are mentioned here. Fleck testified that the risers had been rewrapped before and were now corroded and that the exhaust manifold showed some signs of corrosion. He testified similarly with respect to Sun Power invoice 4781 (P.Ex. 10) that some of the main engine bearings were broken and some corroded and that the piston cylinders and rings were corroded.

With respect to Sun Power invoice 4992 (P.Ex. 11), Fleck testified as before that the gaskets were broken and other things corroded. Invoice 4992, dated February 16, 1979, contains a notation "Paid 5/79." Pascoe's comment that it duplicates page 3 of Invoice 4955 (P.Ex. 11A), dated July 2, 1979, appears to be correct. Although this Court cannot judge from parts listings whether this is a case of use of the same parts on different engines or duplication of charges for the same work, the items shown on P.Ex. 11 are listed, with some additions, beginning at the bottom of page 2 of P.Ex. 11A and continuing through the top of page 4. There are a few differences in the amounts charged.[6] Some general items appear exactly the same on both invoices, however, for example, "Rebuild control box (parts and labor) $692.32." Fleck testified that the wires in the main engine control box were melted after the sinking.[7] One new starter, which according to Fleck's testimony was for the main engine, and repair

of a second one are billed in Invoice 4995. A charge for a starter, at the same price is also shown on Invoice 4992. What appears to have happened is that the items listed on 4992 were rebilled on 4955.

Plaintiff sustained its burden of proving damages with respect to most of the challenged items of engine and generator repairs, through the testimony of Fleck concerning pre- and post-sinking condition and the reasonable inferences to be drawn from his testimony, together with the Broward invoices. Pascoe's initial estimate (P.Ex. 38) also afford some support to plaintiff's case.

Certain items are disallowed. For the reasons discussed above, the charges for parts shown on Sun Power invoice 4992 are disallowed. Allowance of mileage in some amount for Sun Power personnel is reasonable. Its own charges are sufficient, however, Broward's additions will not be allowed. It does not appear that Sun Power was billing materials at cost, and Broward's additional markup on materials is also disallowed. Sun Power billed some labor at $24.50 an hour, some at $20.00. Broward's markup on labor produces effective rates of $27.69 and $22.60 for the Sun Power work. Broward's hourly rates for mechanical work do not appear on the invoices.[8] Captain Fleck testified that Broward was charging $30 to $35 an hour for its work at this time, although Captain Lowe's testimony differed. Examination of the labor charges on mechanical or electrical work on the invoices tends to indicate that Broward was charging $30 an hour, then $31.50 for mechanical work. The labor rates for Sun Power work, even after markups are fair and reasonable and will be allowed.

---

**6.** A head gasket was $20.13 on invoice 4992, $25.61 on invoice 4955. Four relays were billed at $40.81 on invoice 4992; on invoice 4955 two were billed at $37.10 each and two were supplied at no charge. A panel billed at $573.13 on invoice 4992 is shown at no charge on invoice 4955.

**7.** The starboard and port engines were not damaged to the same extent. Immediately af-

ter the vessel was raised they were checked. The port engine started, the starboard engine did not. A reasonable inference is that there would not be exact duplication of items of work for the two engines.

**8.** There are a few backup documents for labor on item 16, showing a rate of $22 an hour. The work done appears to be carpentry or similar work, for which a lower rate is charged.

The amounts on this item are calculated as follows:

| | |
|---|---|
| Total claimed on engines and generators | $ 43,263.18 |
| Amounts disallowed: | |
| Broward parts charges for Sun Power invoice 4992 [9] | 3,163.93 |
| Broward excess labor charge [10] for Sun Power invoice 4992 | 731.51 |
| Broward markups on parts on Sun Power invoice 4781 and 4955 | 1,745.85 1,281.11 |
| Broward's markups on mileage on Sun Power invoices | ·39.92 |
| Total disallowed | (6,962.32) |
| Net amount allowed on engines and generators | 36,300.86 |

### Bilge pumps

Charges of $550.99 and $488.49 were made on Items 4 and 7 for furnishing and installing two bilge pump motors. Pascoe allowed $340.00 and $298.00 on these items for replacement of the pumps and labor charges at $25 an hour. What apparently transpired is that after an initial survey, the two pumps were repaired, and motors replaced, although in retrospect replacement of the entire units would have been cheaper. Pascoe participated in the initial survey in which the decision to repair was made (D.Ex. 6, ¶¶ 6, 8). Lowe's testimony established that the work billed was actually done and Fleck testified that the charges were reasonable. The additional charge of $401.48 is allowed.

### Water pressure system

Item 11, covering repairs to the water pressure system, presents a similar situation. A charge of $1,329.70 was made, and Pascoe allowed $800.00 as a reasonable replacement cost. Again, Pascoe participated in the decision to replace the motor and repair other parts of the systems (D.Ex. 6, ¶ 12). This additional $529.70 charge is allowed for the same reasons given above.

### Summary

The amount of damages allowed for engines and generators is $36,300.86, for bilge pumps is $1,039.48 (Items 4 and 7) and for the water pressure system is $1,329.70, a total of $38,670.04. State sales tax will be added to labor and materials charges, which total $38,406.04, exclusive of $264.00 mileage. The damages allowed on these items, exclusive of interest, is $39,942.28.

The amount of the judgment is increased by a total of $26,280.57, exclusive of interest. This amount is calculated as follows:

| | |
|---|---|
| Revised amount for engines and generators | $ 36,300.86 |
| Amount previously allowed | (11,952.11) |
| Increase | 24,348.75 |
| Revised amount for Items 4 and 7 | 1,039.48 |
| Amount previously allowed | (638.00) |
| Increase | 401.48 |
| Revised amount for Item 11 | 1,329.70 |
| Amount previously allowed | (800.00) |
| Increase | 529.70 |
| Increase without tax | 25,279.93 |
| Tax at 4% on labor and materials (25,279.93—264.00 mileage) | 1,000.64 |
| Total increase | 26,280.57 |

## AMENDED AND SUPPLEMENTAL JUDGMENT ORDER

For the reasons set forth in the foregoing Memorandum, it is this 28 day of September, 1982, by the United States District Court for the District of Maryland, hereby

ORDERED:

1. That plaintiff's motion to amend findings and judgment be and the same hereby is, GRANTED in part and DENIED in part. This Court's findings on damages are amended, as set forth in the foregoing Memorandum, to allow a total of $39,942.28 for engines and generators, bilge pumps, and water pressure system. The findings on damages, including prejudgment interest, otherwise remain the

---

**9.** Broward used a 20 percent (20%) markup on this invoice, without breaking down the amounts for labor and materials. (See P.Ex. 17). For the other Sun Power invoices, Broward applied a 20% markup to parts and a 13% markup to labor. The Broward disallowed parts charge is 120% of the Sun Power charge for parts.

**10.** Labor was allowed only at Broward's 13% markup.

same. The judgment is hereby amended to increase the principal amount awarded plaintiff by a total of $26,280.57.

2. That the Clerk of Court shall send copies of this Memorandum and Amended and Supplemental Judgment Order to counsel for the parties.