---

## THE CENTAURUS.

### In re STRUTHERS & DIXON, Inc.

(District Court, D. Maryland. August 29, 1922.)

No. 892.

1. **Maritime liens ⨀65—Evidence held to show agent of shipowner, claiming lien for advances, was general agent.**

Evidence that the agent of a shipowner, which claimed a preference lien against the ship for advances made, acted as agent for the other ships of the owner, and presented its accounts, transmitted funds, and received remittances from the owner, without specifying the particular vessel for whose account the services had been rendered or the payments made, *held* to show that the agent was a general agent within the law of admiralty, notwithstanding testimony by its officers that they believed they were reserving a lien on each vessel for advancements to it.

2. **Maritime liens ⨀65—General agent of shipowner not presumed to have lien for services.**

There is a presumption that a general agent of a shipowner has no lien on the ship for his advances, though that presumption may be rebutted.

In Admiralty. Libel by the Standard Oil Company of New Jersey against the steamship Centaurus. On intervening libel by Struthers & Dixon, Inc. Intervening libel dismissed.

⨀For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for intervening libelant Struthers & Dixon, Inc.

Janney, Stuart & Ober, of Baltimore, Md., and Bigham, Englar & Jones, of New York City (Stuart S. Janney, of Baltimore, Md., and T. Catesby Jones and Charles F. Quantrell, both of New York City, of counsel), for claimant.

ROSE, District Judge. Struthers & Dixon, Inc., will for brevity be referred to as the agent, and the Green Star Steamship Corporation, which owned the steamship against which the intervening libel is filed, as the owner. The home port of the ship was New York. The agent's principal office was in San Francisco, and it was at the latter port, or others upon the Pacific, that the advances which the agent here asserts to be a maritime lien upon the ship were made.

At the times material to this controversy, the owner employed upwards of a score of vessels in the Pacific trade. Some of them it owned; others it operated for the United States Shipping Board. For all of them the agent procured and loaded cargoes, issued bills of lading, advertised sailings, executed charter parties for such of them as carried bulk cargoes, and expended money in payment of crews' wages, for repairs, pilotage, towage, wharfage, stevedoring, customs, and port dues, and for other things required for them. It collected a large part of the freight coming to them; in some instances, it remitted these collections to the owner, and drew drafts upon the latter for its disbursements; and in others, the freight moneys were applied by it in whole or in part to reimbursing itself for the advances it had made. It claims to have kept separate accounts of the receipts and expenditures from and for each ship, but its remittances to the owner of funds derived from several vessels were at times made in round sums, which did not represent either the exact amount from any one vessel or the precise total from any number of them, and payments were made to it in like manner. In these respects, at least, the parties dealt with each other precisely as if all the items of debit and credit formed part of one running account. Indeed, the agent claimed the right to treat all the ships operated by the owner as if owned by it, and to apply receipts from any one of them to anything which the owner might owe it for advances made on account of others. The something over $10,000 for which it claims the Centaurus is liable in rem was paid out some time before November 30, 1920, and the intervening libel was not filed until more than 15 months later.

In statements rendered between the parties, this money formed part of a total described as "balance old steamers' accounts prior to November 30, 1920," which at one time amounted to more than $91,-000. It is admitted the owner subsequently paid $25,000 on account of the $91,000, without giving any direction as to the application to any particular ship or ships, and without, so far as the evidence discloses, the agent ever having appropriated it to any. During the time at which the advances were made, the relations between the owner and the agent were so close that, except in contemplation of law, they were in fact one.

In February of 1920 the owner agreed to purchase all the stock of the agent, and that stock was then deposited in escrow with a trustee, to be held until it was paid for. While it was in that situation, the owner had the right to vote it, and did, placing its nominees on the board of directors of the agent. The president of the agent became a salaried vice president of the owner, and the treasurership and auditorship of the two were held by the same people. In the end, after the owner had paid $500,000 of the purchase price, it defaulted on the balance, and the trustee, in the summer of 1921, sold the stock of the agent held by it, and the control of the agent in consequence passed out of the owner. It is admitted that there never was an express agreement, whether oral or written, by which the agent reserved a lien upon the ships for its advances.

The claim that such lien exists rests upon the fact that accounts were kept separately with each ship, and upon the testimony of the agent's officers that they intended to secure a lien for its advances and supposed that they had. Good bookkeeping required that the books should be so kept as to show the financial results of each voyage of each ship, precisely as it would have done, had the agent been running for the owner not vessels but mills or shops. It does not appear that payments made by the owner on account of consolidated balances due the agent for a number of ships were ever allocated to them severally.

[1, 2] The mere belief of agent's officials that it was reserving a lien upon the ships will not of itself, under the circumstances here existing, create one, even if the present statements of the witnesses as to their state of mind two years ago could on such a question carry conviction, no matter in what degree of good faith they may be made. There can be no doubt that the agent in this case was a general agent, as that phrase is used in the law of the admiralty. In America it is well settled that the presumption is that such an agent has no lien on the ship for his advances. The presumption, it is true, is not conclusive. It may be rebutted, but the cases in which it has been are few, and in them the facts were very unlike those here in evidence. What has been said suffices to dispose of the intervening libelant's contentions.

It may be added that a court of admiralty would at least pause before it held that an agent, sustaining the close relations to the owner here shown, could wait 15 months and more before asserting a right to preferential payment over the other creditors of the owner, many of them doubtless having become so after the agent made its advances.

It follows that the intervening libel must be dismissed, with costs.