661 F.2d 310
 AMEEJEE VALLEEJEE AND SONS, Appellees,
v.
M/V VICTORIA U., (Ex Pishtaz Iran), her engines, boilers,
tackle, furniture, apparel, etc., in rem, Appellant.
AMEEJEE VALLEEJEE AND SONS, Appellants,
v.
M/V VICTORIA U., (Ex Pishtaz Iran), her engines, boilers,
tackle, furniture, apparel, etc., in rem, Appellee.
 Nos. 81-1014, 81-1015.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 5, 1981.
Decided Oct. 9, 1981.
 
 John H. West, III, Baltimore, Md. (M. Hamilton Whitman, Jr., Ober, Grimes & Shriver, Baltimore, Md. on brief), for appellee in 81-1014 and for appellant in 81-1015.
 Robert P. O'Brien, Baltimore, Md. (Donald A. Krach, Niles, Barton & Wilmer, Baltimore, Md., on brief), for appellant in 81-1014 and for appellee in 81-1015.
 Before WINTER, Chief Judge, WIDENER, Circuit Judge, and BRITT,* District Judge.
 WINTER, Chief Judge:
 
 
 1
 These appeals turn upon whether or not Ameejee Valleejee and Sons (Amjee) was the general agent for Iran Express Lines (IEL) with regard to calls of the vessel, formerly known as the M/V PISHTAZ IRAN, at the port of Karachi. The district court ruled that Amjee was IEL's general agent and disallowed Amjee's claim to a maritime lien except with respect to necessary repairs to the PISHTAZ IRAN made after the outbreak of the Iranian Revolution. The district court concluded that then Ameejee relied, not on the credit of IEL, but on the credit of the vessel. It entered judgment for Amjee for $79,935.45, including prejudgment interest at the rate of 6%, but denied the balance of its claim and its claim to prejudgment interest at the rate of 14%. Both parties appeal.
 
 
 2
 The parties dispute neither the facts nor the applicable rules of law. They differ only in the result which follows from the application of those principles to the facts established here. Our view of the application of those legal principles to the facts leads us to conclude that Amjee was never the general agent of the vessel. We therefore vacate the judgment of the district court and remand the case for entry of judgment in the full amount of Amjee's claim. We also require the district court in allowing prejudgment interest to articulate the reason for the rate it concludes to allow.
 
 I.
 
 3
 The undisputed facts are set forth in some detail in the opinion of the district court and we need restate only the salient ones: Amjee, a Pakistani partnership, served as agents for IEL for vessels owned and chartered by IEL calling at the Port of Karachi from 1974 until the disintegration of IEL in connection with the Iranian Revolution in 1978-79. Under the agency agreement, Amjee supplied "berth services" to IEL vessels providing stevedoring services and arranging for supplies and provisions, assisting in dealing with local Pakistani officials, making freight collections, booking cargoes outward bound, advancing funds for necessaries, and other miscellaneous services.
 
 
 4
 Amjee did not, on its own authority, arrange or supervise major ship repairs, pay IEL crews, make decisions concerning port calls at Karachi, schedule itineraries prior to or after departure from Karachi, schedule loading of cargo, accept nonroutine cargo, or exercise any control over any IEL vessel outside of the Port of Karachi. These latter duties were performed by Uiterwyk Corporation (Uiterwyk), general agents of IEL in the United States and shipping manager for the line worldwide. Many of Uiterwyk's officers and stockholders were also officers and stockholders of IEL. Amjee did significant business with IEL but was not affiliated with it or Uiterwyk.
 
 
 5
 From 1974 through 1979, twelve IEL ships were serviced by Amjee at Karachi. Only the M/V PISHTAZ IRAN, and one other vessel called at Karachi more than once. Amjee and IEL settled their accounts on a running basis, but Amjee did break out disbursements and receipts on a ship-by-ship basis. For practical purposes, however, Amjee did recurring business only with the PISHTAZ IRAN, which was apparently the only ship actually owned by IEL.
 
 
 6
 In October 1978 IEL informed Amjee that the PISHTAZ IRAN was scheduled to arrive in Karachi from Khorramshahr, Iran, in November for repair and drydocking. The Iranian Revolution, however, idled the ship in Khorramshahr and cut off communication with IEL. When the ship finally managed to sail in March, Amjee performed its ordinary preparatory berth services and also apparently advanced a deposit demanded by the shipyard on some necessary drydock work. The drydocking had been arranged by Uiterwyk, and the ship remained in drydock in April and May. Amjee eventually advanced the balance of the payments due the shipyard with a bank-guaranteed note in addition to the other necessaries it provided. Uiterwyk, however, supervised the overhaul, even sending an engineer to monitor the work. Uiterwyk promised to reimburse Amjee, at least out of future prepaid freights. After the PISHTAZ IRAN sailed from Karachi in May 1979, it never returned to Pakistan. It was subsequently acquired by another owner, many of whose officers and stockholders were also principals of Uiterwyk, and renamed. Neither Uiterwyk nor IEL ever paid Amjee for the monies it disbursed on the vessel's behalf.
 
 II.
 
 7
 The parties do not dispute, and we agree, that as a general proposition of law a general agent of a ship, as distinguished from a special agent, is not permitted to assert a maritime lien against the ship except in those rare instances where the general agent by express agreement with the owner is given a lien on the vessel, or there are present such circumstances as to imply such an agreement. The rationale of the rule is that a general agent is so closely related to the owner that he is presumed to have made advances on the credit of the owner rather than that of the ship. Conversely, a special agent, having no close ties or relationship to the owner, is presumed to make advances on the credit of the ship. G. Gilmore and C. Black, The Law of Admiralty, § 9-20, p. 626, n.89 (1975); 2 Benedict on Admiralty, § 33, pp. 3-16 and 3-17 (7th Ed. 1975).
 
 
 8
 The recognized leading case on the difference between a general and a special agent for purposes of recognizing a maritime lien is Todd Shipyards Corp. v. The City of Athens, 83 F.Supp. 67 (D.Md.1949) (Chesnut, J.). As Judge Chesnut pointed out in the beginning of his discussion, "(t)he problem in each case is to determine from the facts the scope of the authority of the agent in the light of the relationship between the principal and agent ..." (emphasis added). Id. at 88. In that case the agent for The City of Athens performed functions at Genoa and Naples very similar to those performed by Amjee for the PISHTAZ IRAN. The ship called at Genoa four times and at Naples twice. The agent had no control over the ship's movements. Judge Chesnut decided that the agent was merely a special agent because of his limited scope of responsibilities and the lack of continuity of service with the owner, evidenced by the segregation of accounts for each voyage. 83 F.Supp. at 88-89. He distinguished The Centaurus, 282 F. 883 (D.Md.1922), aff'd, 291 F. 751 (4 Cir. 1923), because of the longer service and greater responsibility of the agent in that case. He relied on the Restatement of Agency § 3 for the significance of continuity of service in determining whether an agent was special or general. Continuity of service was relied on by the district court in the instant case as an important factor for its holding that Amjee was IEL's general agent and hence not entitled to a maritime lien.
 
 
 9
 While The City of Athens stressed continuity of service as an important factor in rendering an agent a general agent, continuity of service has not been a significant factor in the decisions of other courts. See, e. g., Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197 (1940), aff'g International Terminal Operating Co. v. S/S VALMAS, 375 F.2d 586 (4 Cir. 1967), aff'g The Stjerneborg, 106 F.2d 896, 897 (9 Cir. 1939); indeed The City of Athens recognized that "the potency of the 'general agent' rule has been somewhat impaired if not eliminated by the federal lien statute (46 U.S.C. § 971) which in terms gives the lien to 'any person.' " 83 F.Supp. at 89. Some courts have viewed the federal lien statute as establishing a presumption that necessaries are provided on the credit of the ship, so that "a maritime lien arises unless it is affirmatively established that it was done solely on personal credit." Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co., 261 F.2d 861, 867 (5 Cir. 1958).
 
 
 10
 Notwithstanding the emphasis on continuity of service contained in The City of Athens, we think that the more important factor in the determination of whether agents are general or special is the degree of authority which the owners have delegated to them. Although continuity of service is a factor to be considered, we think that one may be a general agent for a single transaction involving a ship; and, conversely, one may be a special agent over a period of years involving numerous transactions. To repeat, the more important factor is the scope of the agent's authority. If the delegated authority is substantial, the agents are general agents; but if the authority is limited to getting a vessel in and out of a particular port, the agents are special agents and may assert maritime liens. See 2 Benedict on Admiralty § 33, supra. Two cases in our own circuit are illustrative of the principle, because both deal with circumstances where the agent was vested with a substantial portion of the owner's authority.
 
 
 11
 In Savas v. Maria Trading Corp., 285 F.2d 336 (4 Cir. 1960), a marine engineer was held to be a special agent for services he performed on a ship in Norfolk and in Baltimore but was held a general agent for services performed in Bremen. The distinction was simply that he went to Bremen as the owner's representative to supervise work at a German yard, whereas he performed the work in this country independently. 285 F.2d at 338-39. The circumstances suggested continuity of service but the determinative factor was clearly the scope of the agent's delegated authority, and thus the degree of reliance on the credit of the ship. Similarly, in The Centaurus, supra, where the agent was not permitted to claim a maritime lien, the district court carefully noted that the owner had agreed to purchase all the stock of the agent, exercised voting control of the stock, that the president of the agent became a salaried vice president of the owner, and that the owner paid over a quarter of the amount due for the agent's prior advances without any allocation of the amount to any ship of the fleet managed. Accord, The West Irmo, 1 F.2d 87 (3 Cir. 1924) (same owner and agent, common control emphasized).
 
 
 12
 Here, Amjee clearly dealt with Uiterwyk and IEL at arm's length. Uiterwyk, not Amjee, acted as the general agent proscribed from lien acquisition by the law of admiralty. It directed the ship's movement, managed the subcontractors for services, including Amjee, and at all times maintained an extraordinary interlocking of ownership and control with IEL, the owner of the PISHTAZ IRAN. See The M. Vivian Pierce, 48 F.2d 644 (D.Mass.1931). By contrast, Amjee performed very limited functions and the scope of its authority was quite restricted.
 
 
 13
 We therefore conclude that Amjee was a special agent entitled to assert a maritime lien for its full claim and that the district court incorrectly ruled it a general agent. In view of this holding, we need not consider the correctness of the district court's holding that with respect to part of its claim Amjee fell within the exception to the rule prohibiting a general agent from asserting a maritime lien.
 
 III.
 
 14
 In allowing prejudgment interest, the district court fixed the rate at 6%. It articulated no reason why it considered this rate the proper one.
 
 
 15
 The award of prejudgment interest in admiralty cases rests within the sound discretion of the district court. See Gardner v. The Calvert, 253 F.2d 395, 402-03 (3 Cir.), cert. denied, 356 U.S. 960, 78 S.Ct. 997, 2 L.Ed.2d 1067 (1958) (court not bound to charge maximum legal rates of interest). When allowed, prejudgment interest is considered an element of damages in admiralty, part of full and fair compensation to the injured party. See Gulf Oil Corp. v. Panama Canal Co., 481 F.2d 561, 570-71 (5 Cir. 1973) (Brown, C. J.); Norfolk Shipbuilding & Drydock Corp. v. The M/Y La Belle Simone, 537 F.2d 1201, 1204 (4 Cir. 1976). Accordingly, the district courts are not bound by state statutory maximums in setting the rate of prejudgment interest in admiralty cases, and indeed have been urged to follow the interest rate prevailing commercially. United States v. M/V Gopher State, 614 F.2d 1186, 1190 (8 Cir. 1980); Sabine Towing and Transportation Co. v. Zapata Ugland Drilling, Inc., 553 F.2d 489, 491 (5 Cir.), cert. denied, 434 U.S. 855, 98 S.Ct. 175, 54 L.Ed.2d 127 (1977); but cf. United States v. M/V Zoe Colocotroni, 602 F.2d 12, 14 (1 Cir. 1979) (Coffin, C. J.) (failure to award higher commercial rate instead of statutory maximum no abuse of discretion).
 
 
 16
 The record, however, does not show the basis on which the district court exercised its discretion. There is testimony that Amjee borrowed funds to replenish its advances to the PISHTAZ IRAN at a rate of 14%. The statutory maximum interest rate in Maryland is 10%, the rate of postjudgment interest fixed by the district court. Nothing in the present record shows why the district court fixed the prejudgment rate at 6%.
 
 
 17
 We do not indicate to the district court how, on remand, its discretion to allow prejudgment interest should be exercised. But we do require the district court in making an allowance of prejudgment interest to disclose the reasons why it selected the rate that it concludes to fix. Where, as here, there is nondisclosure and the reasons are not otherwise apparent, appellate scrutiny for possible abuse of discretion is impossible; and we would otherwise be required to remand the case for further explication by the district court.
 
 
 18
 VACATED AND REMANDED.
 
 
 
 *
 Honorable W. Earl Britt, United States District Judge for the Eastern District of North Carolina, sitting by designation