**GEORGE'S RADIO AND TELEVISION COMPANY, INC., Plaintiff,**

v.

**INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

Civ. A. No. J–80–1392.

United States District Court,
D. Maryland.

April 14, 1982.

John T. Ward, Jonathan A. Chase, Ober, Grimes & Shriver, Baltimore, Md., for plaintiff.

J. Paul Mullen, H. John Bremermann, III, Baltimore, Md., for defendant.

## MEMORANDUM OPINION

SHIRLEY B. JONES, District Judge.

The yacht GEORGEJAN, owned by plaintiff, sank on January 3, 1979. Insurance Company of North America (INA) denied coverage under a marine all risks insurance policy on March 7, 1979. This action on the policy was filed on May 30, 1980, and tried to this Court on July 27, 28, and 30, 1981. An oral ruling in favor of plaintiff on liability was made, and determination of the amount of damages was reserved. The parties submitted a joint schedule of damages (Paper No. 15), in which the amounts claimed by plaintiff, those allowed by defendant, and those disputed are listed. The reasons for defendant's objection are also noted; some items are contested as not necessary, some as exceeding the scope of repair necessary, and some as not fair and reasonable charges for the work performed. The disputed charges total $42,488.48, $44,188.02 with tax. In addition to the disputed repair items, plaintiff seeks, and defendant vigorously opposes, an award of prejudgment interest at the rate charged by its commercial lender.

This opinion constitutes the Court's findings of fact and conclusions of law with respect to damages. This Court finds that plaintiff is entitled to recover damages in the amount of $44,203.24 ($47,203.24 minus a $3,000 deductible), the amount defendant has agreed was attributable to the sinking and was fair and reasonable. Only the disputed items are discussed in this opinion.

### Disputed repair items

A plaintiff has the burden of proving damages, including proof that they were caused by the incident in question and that the amounts claimed are fair and reasonable. *E.g., United States v. M/V Gopher State*, 472 F.Supp. 556 (E.D.Mo.1979), *aff'd*, 614 F.2d 1186 (8th Cir. 1980). Testimony on physical damages for the plaintiff came from Rudolph Fleck, captain of the GEORGEJAN from 1977 to mid-February 1979, and Stewart Lowe, captain of the vessel from mid-February 1979 until April 1980. Captain Fleck was in charge of the vessel at the time of the sinking, and he observed its condition immediately after the occurrence. Fleck was qualified as an expert, based on his familiarity with repair costs as captain of this and other vessels, on the fairness and reasonableness of repair charges, such as mechanical repairs and replacement, painting and other work on the deck and fittings. He was not permitted to testify as a mechanic or marine surveyor, on the necessity of particular repairs, nor did he qualify as an expert on the value of furnishings such as carpets and drapes. He was, of course, permitted to testify as to his personal observations on the condition of various items. Lowe did not qualify as an expert in any respect.

David Pascoe, an expert marine surveyor, testified on damages for the defendant. He visited the vessel and took photographs on January 9, 1979 for a little over an hour. He returned to survey the engines on January 17, 1979, again for a little over an hour. He did not see the port engine disassembled at all and only saw the starboard engine partially disassembled. Pascoe later reviewed the repair invoices and prepared breakdowns of allowable costs. (D. Ex. 14, 15, 16). Disallowances were made where he believed the item was not attributable to the sinking, for example, parts he thought should not have needed replacement, and where he could not identify the part or its

use. He disallowed one-half the cost of refinishing and varnishing (Broward 5881, Item 28, 5880, Items 3, 5, 7 and 8) because he thought one coat of varnish, using spot primer, was sufficient to repair the damage.

Captain Fleck testified concerning the condition of the boat interior before and after the sinking. The substance of his testimony was that all interior furnishings such as carpet, drapes, and furniture were in excellent condition before the sinking. When he returned to the vessel on January 3, 1979, he found it submerged at an angle, bow down. Areas and quarters near the bow were completely flooded; the area of least flooding was the aft cabin, with two feet of water. Captain Fleck observed water, with oil and engine acids floating on top of it, throughout the boat. When the boat had been pumped out, Fleck saw formerly white carpet now black; drapes, furniture, appliances, wall coverings, mattress and bed linens soaked, stained and oily; and teak walls and other cabin fittings warped. A reasonable inference can certainly be drawn that the interior damage was caused by the sinking and even that, based on the extent of the damage, replacement of many items was necessary. Plaintiff presented no competent testimony, however, on the fairness and reasonableness of the charges for these items.

Fleck testified that before the sinking the paint and varnish work was in "mint" condition, work having been done only two months before in November 1978. Afterwards, the decks were badly stained and scratched, the paint on the starboard side was badly scarred, and the paint on the port side was scratched. I find Captain Fleck's testimony that the paint on the port topsides was scratched more credible than Pascoe's testimony that it was not, given Fleck's meticulous attention to the condition of the vessel and his far greater opportunity to observe its condition after it was raised. The item for painting that side of the vessel (Broward 5881, Item 27, $947.36 including sales tax) is accordingly allowed.

■ Captain Fleck gave detailed testimony on his observations of the condition of the engines and generators after the sinking. Although reasonable inferences can be drawn concerning the reason for the damage, they do not enable plaintiff to sustain its burden of proof on damages. Plaintiff failed to present expert testimony on the necessity for or scope of the disputed items of repair or replacement. The disputed mechanical repair items must be disallowed. The same is true of the disputed paint and varnish items, which concern the necessity of a second coat.

### Prejudgment interest

■ Prejudgment interest is often awarded in admiralty cases, and the Fourth Circuit has approved it in an action on a maritime insurance policy, *National Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177 (4th Cir.), *cert. denied*, 358 U.S. 823, 79 S.Ct. 38, 3 L.Ed.2d 64 (1958). Awarding prejudgment interest is a matter within the Court's discretion to afford full and fair compensation to the injured party. *Ameejee Valleejee & Sons, Inc. v. M/V Victoria U.*, 661 F.2d 310, 313 (4th Cir. 1981); *Norfolk Shipbuilding & Drydock Corp. v. M/Y La Belle Simone*, 537 F.2d 1201, 1204 (4th Cir. 1976); *Newport News Shipbuilding & Drydock Co. v. United States*, 226 F.2d 137, 143 (4th Cir. 1955). The rate of interest and the date from which it runs are within the Court's discretion, *Valleejee & Sons*, 661 F.2d at 313–14; *M/Y La Belle Simone*, 537 F.2d at 1205 n. 2, although the trial court must explain why it has selected a particular interest rate, *Valleejee & Sons*, 661 F.2d at 314. Admiralty courts are not bound by state statutory maximum interest rates in determining the appropriate rate of interest. *Id.* at 313–14.

■ Prejudgment interest is awarded to put the injured party in the position he would have occupied had the defaulting party fulfilled his obligation, *Newport News Shipbuilding*, 226 F.2d at 143, to afford full compensation, *M/Y La Belle Simone*, 537 F.2d at 1204. Had INA not denied coverage, plaintiff would have had funds to apply to the cost of repair of its vessel in 1979. Regardless of the company's

good faith in denying coverage, plaintiff is entitled to recover interest from the date coverage was denied, March 7, 1979. *See National Union Fire Ins. Co.*, 254 F.2d at 188.

Deciding the proper rate of interest is a more difficult question. Admiralty courts have awarded interest based on the plaintiff's actual cost of borrowing, *Complaint of M/V Vulcan*, 553 F.2d 489 (5th Cir. 1977) (per curiam); average prime interest rate, *General Facilities, Inc. v. National Marine Serv., Inc.*, 664 F.2d 672 (8th Cir. 1981) (per curiam); state statutory interest rate, maximums, *Signal Oil & Gas Co. v. Barge W–701*, 654 F.2d 1164 (5th Cir. 1981); market investment earnings rates, *United States v. M/V Gopher State*, 614 F.2d 1186, 1190 (8th Cir. 1980); *Sauers v. Alaska Barge & Transp., Inc.*, 600 F.2d 238 (9th Cir. 1979); and contractual rates, *M/Y La Belle Simone*, 537 F.2d at 1204–05.

Plaintiff presented testimony concerning the rate of interest it was paying a commercial lender on its line of credit at the time of the accident through 1981. It was financing its debt at 1¾% over prime (P. Ex. 1). Edgar Legum, former president of George's Radio, testified that the average prime rate in 1980 was between 14 and 15% and in 1981 was 20 or 21%.

Loss of use of money can be valued in two ways, by measuring its replacement cost or its earning potential. In seeking prejudgment interest at 1¾% over the prime rate, plaintiff measures the value at precisely the cost to it of replacement. As defendant notes, a problem with this approach is that because plaintiff was locked into its arrangement with its financing bank, the rate plaintiff urges may not represent the market rate for replacement of money. The prime rate is itself a commonly used and readily available measure of the market cost of replacing money through loans. There was no testimony that any loans were taken out to pay for repairs to the GEORGEJAN, although advances were made in 1979 and 1980 against plaintiff's line of credit for business operating expenses, of which the repair costs were a part.

Another available measure of the replacement cost is Maryland's legal interest rate of six percent for usury purposes. Md. Comm.Law Code Ann. § 12–102 (1975). The simple interest rate is and has been subject to several exceptions, *id.* § 12–103 (1975 & 1981 Supp.), that more accurately reflect market conditions.

■ The basis for an award of prejudgment interest in admiralty cases, and generally, is the principle of making an injured party whole. Absent special circumstances, the approach most consonant with the general purpose is to measure loss of use of money by what a plaintiff could reasonably have earned on it. *See Matter of Bankers Trust Co.*, 658 F.2d 103, 112 (3d Cir. 1981). One possible way to measure rate of return is to use Maryland's postjudgment interest rate. The Maryland legislature in 1980 enacted a statute providing for interest on judgments at the rate of ten percent, Md. Cts. & Jud.Proc.Code Ann. § 11–107 (1981 Supp.), in apparent recognition of changing economic conditions.[1] It would certainly be anomalous, particularly in light of current market conditions, to award prejudgment interest at a lower rate than a judgment bears. *See Valleejee & Sons*, 661 F.2d at 314.

■ Other possible measures of a reasonable rate of return are the yields from government and corporate securities. No testimony was presented concerning market rates of return, but this Court may take judicial notice of this kind of fact, Fed.R. Evid. 201(b)(2), at any stage of a proceeding, *id.* 201(f), even though not requested to do so, *id.* 201(c). The rate of return obviously varies significantly depending on the kind of investment security involved. Cases in this district have adopted in land condemnation cases, which are somewhat

---

**1.** Before the change, effective July 1, 1980, there was no specific provision for interest on judgments, and interest ran at the general six percent maximum rate allowed by the usury statute.

analogous in that the question is just compensation for loss of use of money when a deficiency judgment is entered, the average rate of return on Moody Aaa long-term corporate bonds. *United States v. 97.19 Acres*, 511 F.Supp. 565 (D.Md.1981). This kind of stable investment is an appropriate measure of a reasonable rate of return, and I accordingly adopt it. I take judicial notice that the average interest rate on such securities was 9.63% for 1979, 11.94% for 1980, 14.17% for 1981, and 15.18% for January 1982.[2] (Fed. Reserve Bulletin, February 1982, at A27).

Damages are awarded in the amount of $45,150.60, with prejudgment interest from March 7, 1979, at 9.63% for 1979, 11.94% for 1980, 14.17% for 1981, and 15.18% for 1982.

---

2. This figure is an average of the figures for the weeks ending January 8, 15, 22 and 29, the latest figures available at the time of the writing of this opinion.