**PLYWOOD PANELS, INC., Plaintiff,**

**v.**

**The M/V SUN VALLEY, etc., and Hyundai Merchant Marine Co., Ltd., Defendants.**

**Civ. A. No. 91–354–N.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Oct. 20, 1992.

Guilford D. Ware, Timothy A. Coyle, Crenshaw, Ware & Martin, Norfolk, Va., for Plywood Panels, Inc.

Hyundai Merchant Marine Co., Ltd., in pro per.

## OPINION

DOUMAR, District Judge.

This maritime cargo damage matter comes before this Court after a two-day bench trial on March 3 and 4, 1992. Post-trial briefs were submitted prior to oral argument on May 4, 1992. Plaintiff, Plywood Panels, Inc., ("PPI") seeks to recover damages to cargo shipments carried by defendant carrier, Hyundai Merchant Marine Co., Ltd. ("Hyundai"), from Indonesian ports to United States East Coast ports, including Norfolk, Virginia. Fifty-four shipments of plywood made between 1988 and 1991 are the subject of claims in this case; each shipment represents a separate cause of action. Plaintiff asserts that, in some shipments, physical damage occurred to the exterior of the cargo while in the carrier's possession. Plaintiff further claims that some of the shipments were incomplete.[1]

Defendants assert defenses to the damage claims pursuant to the lumber clause and the settlement clause in their bills of lading. Defendants contend that the plaintiff did not present a prima facie case for

---

1. A few of the shipments are the source of both a damage claim and a shortage claim.

the damage claims as a result of the effect of the lumber clause.[2] Defendants also contest the plaintiff's alleged damages and assert that the recoverable damages are limited by the settlement clause. Plaintiff asserts that neither the lumber clause nor the settlement clause in the bills of lading should be applied in this case. Plaintiff believes that the Court should hold that it presented a prima facie case for each damage claim and should award it the full amount of damages sought.

Upon completion of plaintiff's case-in-chief, the defendants rested without presenting evidence. On the Court's suggestion, with the agreement of the parties, the plaintiff's plywood processing factory in Norfolk, Virginia, was viewed in order to observe the manner in which damaged plywood was handled.

The Court finds that the plaintiff established a prima facie case of carrier liability for exterior damage in accordance with the Carriage of Goods by Sea Act, 46 U.S.C.App. § 1300 *et seq.* The Court further finds that the settlement clause limiting damages applies to the claims of physical damage, but that even if it does not apply, that the plaintiff may recover only the measure of damages specified by the Court herein.

### Issues Presented

At issue is whether plaintiff shipper's presentation of the defendant carrier's bills of lading, which contain a "lumber clause" and no notations by defendant of any damage upon the shipper's delivery of the lumber cargo to the carrier prior to shipping, constitute prima facie evidence of the good condition of the cargo upon the delivery to the carrier for shipping, pursuant to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C.App. § 1303(4). A related issue is whether the carrier's lumber clause in the bills of lading as interpreted by Hyundai is invalid under COGSA, 46 U.S.C. § 1303(3),

(8), which requires a carrier to note the apparent order and condition of goods on a bill of lading and forbids a clause lessening liability for negligence.

If the Court finds that plaintiff presented a prima facie case of damage, then the Court must decide the measure of damages and thereby decide whether the settlement clause in the bill of lading limits the measure of plaintiff shipper's recovery or whether plaintiff may recover based on the difference between fair market value and salvage resale value, in addition to survey costs and salvage handling costs, which include labor and business interruption cost.

### Statement of Facts

The parties have stipulated that Hyundai is a carrier within the meaning of the Carriage of Goods by Sea Act (COGSA). Plaintiff, PPI, is a manufacturer of plywood in Indonesia and is one of the largest exporters of plywood to the United States. Plaintiff asserts claims for physical damage to the exterior of the packaged plywood cargo, in the form of gouges and stains, which was present upon delivery by defendants and observable after unloading from the vessel. Plaintiff also asserts that crates from at least five shipments contained less than the contract amount of plywood.[3] The parties have stipulated that defendant Hyundai issued identical bills of lading for all of the cargo in the fifty-four shipments. The language of the bills of lading at issue in this case is set forth below.

The front upper right side of the bill of lading issued by Hyundai, states in part:

> Shipped on board the goods or package(s) said to contain goods marked and numbered as hereunder (weight, measurement, quality, contents and value—except for the purpose of estimating freight—unknown), *in apparent good*

---

**2.** The lumber clause essentially states that the bill of lading's representation of apparent good order and condition of the cargo is not a representation as to the absence of breaks, cracks, stains, shaves, warps, shakes, splits, holes or broken pieces in the lumber cargo.

**3.** The shipments and corresponding action numbers involving shortage were numbers 23, 29, 45, 49, and 53.

*order and condition unless otherwise stated hereon, ...*

(emphasis added). The reverse side of the bill of lading has twenty-six paragraphs in fine print. Paragraph 20 is entitled "Lumber" and states in its entirety:

> Any statement hereon that logs, lumber, timber, plywood or product thereof have been shipped in apparent good order and condition does not involve any admission by the Carrier as to the absence of breaks, cracks, stains, chafes, warps, shakes, splits, holes or broken pieces, and this clause shall be deemed to constitute express notice to all persons making delivery of the goods on the terms of this Bill of Lading that such goods do or may contain pieces so affected.

Paragraph 22 is entitled "Settlement of Claim" and states in pertinent part:

> Any claim for which the Carrier may be responsible shall be adjusted and settled on the basis of the Merchant's net invoice cost plus freight and insurance premium, if paid, and in no event shall the Carried [sic] be responsible for any loss of profit or consequential loss.

There is no notation of damage by Hyundai on any of the bills of lading.

For the past fourteen years, the plaintiff has shipped plywood on board vessels owned or chartered by Hyundai. Indonesia mandates the use of Korean export carriers. Two Korean carriers presently are available, one of which is Hyundai. The PPI factory in Norfolk receives shipments from both carriers; it receives shipments carried by Hyundai at least once a month. The bills of lading used by the parties in prior business dealings with both carriers have contained terminology similar to the bills at issue in this case.

In the past fourteen years, Hyundai and PPI have settled and adjusted numerous claims, never resorting to litigation. PPI has presented claims based on invoice cost, insurance, and freight, in accordance with the settlement clause of the bill of lading, rather than presenting claims based on market value at the time and place of delivery. Those claims have been settled at an amount less than the invoice cost, insurance, and freight.

Hyundai has never made a notation of damages on the bill of lading upon receipt of the cargo for shipping from Indonesia. It is uncontroverted that the lumber clause has not been applied to damaged plywood shipped in this fashion in the fourteen years that the parties have been doing business and settling claims with each other, although PPI was aware of the existence of the clause. This matter represents the first time in fourteen years that the parties have litigated damages in court rather than reaching agreement, even though goods were shipped in the same manner and suffered the same type of resulting damage. In partial payment for the damages, Hyundai advanced PPI $44,548; accordingly, Hyundai claims a credit for that sum. It appears from the evidence that the parties have construed the lumber clause so as not to apply to damages easily observable and ascertainable on the exterior of the packages.

Plaintiff packages the plywood panels, very thin sheets of four-by-seven and four-by-eight feet panels, in bundles of approximately 180–220 sheets. The top, bottom, and ends of the packaged bundles are protected with exterior packaging wood, and bands around the bundles hold them together. There is no contention that the cargo was packaged in an improper manner. The cargos were carried "free in," meaning that the cargos were packaged, loaded, and stowed under the supervision of PPI. Hyundai does not admit that the goods were undamaged upon delivery to the vessel for shipping. Unless the failure to indicate any such damage on the bill of lading creates a presumption of good condition, no direct proof of good condition on delivery was presented in this case.

The plaintiff's claim for damages is based solely on the damage noted by its surveyors at the dockside after the cargo was discharged in the United States. A marine surveyor inspects each shipment at the port and reports any obvious damage to the exterior of the package of plywood. The plaintiff, PPI, introduced the survey

reports as plaintiff's exhibit 63. PPI elicited testimony concerning the survey process from Mr. Dailey, the plaintiff's marine surveyor who inspects the bundles of plywood exported from Indonesia following discharge at Norfolk, Virginia. In this capacity, he has inspected plywood shipments for PPI several times a month for the past several years.

The surveys are conducted by a crate-by-crate visual inspection, without opening the packaging. The plywood cargo could be seen through any broken packaging, and the surveyor estimated the number of panels damaged on the survey reports by external observation at the dockside. Surveyor Dailey gave uncontroverted testimony that any damage claimed in this case was readily observable from the exterior of the crates.[4] It is uncontroverted that the damage was visible to the naked eye upon delivery to PPI in the United States. The Court finds as a fact that the damage to the packaged plywood is observable and obvious to any reasonable observer of the packaged plywood, without opening the package. Regarding the measure of damages, the parties stipulated that Mr. Dailey would testify that twenty-five percent of the survey costs, which were charged by the hour, were due to additional time spent by the surveyors finding and noting damaged cargo.

Two types of wood are shipped to PPI: process wood and specialty wood. The process plywood is shipped to Norfolk, Virginia, to be processed into wall paneling in PPI's factory. The factory has two production lines, each of which can process twenty-nine panels per minute. The panels are fed individually into a production line by a factory worker. The specialty wood is shipped to be traded, not processed.

Plaintiff called two witnesses who testified on the damages issue: the senior vice president of PPI, Mr. MacMaster, who works for PPI in Louisiana, and Mr. Fortin, the plant manager of the PPI factory in Norfolk, Virginia. PPI presented testimony that a process panel would not be processed if its exterior were damaged. Damaged process panels are separated from the panels fed into the line by plaintiff's employees and are collected and sold as salvage.

If a bundle of process panels has substantial exterior damage, the bundle is unpackaged in the yard of PPI's factory and the damaged panels are removed. If a bundle contains a few damaged panels, it is not opened until the time the panels are to be fed individually into the production line. The employees who feed the lines remove any panels with exterior damage from the previously unopened bundle as those damaged panels rise to the top of the pile to be fed individually into the line. Any damaged panels are placed on a rack several feet away from the production line.

Plaintiff employs one employee per production line to feed panels into a line, but a second employee is available to assist. Although one person alone can feed a production line undamaged panels, the plant manager testified that sometimes two employees remove a batch of damaged panels because their size and flexibility make the panels unwieldy. The Court and all parties observed the production process at the factory.

Plaintiff's exhibit 70 is a chart of plaintiff's proposed damage computations for each of the fifty-four shipments. The total amount of damages sought by plaintiff for all fifty-four claims is $325,063.23. The chart's computation of loss on process plywood, after mitigation through sale of damaged plywood, was the fair market value minus the price of the damaged wood sold as salvage, plus the cost of handling the damaged wood, plus 100% of the survey costs. The loss to process wood is calculated separately from that of the specialty wood. Because specialty wood does not go through the production line, interruption of business loss is not a component of the requested recovery.

---

4. The parties stipulated that the surveyor of the shipments to ports other than Norfolk would testify in accordance with the survey reports.

The measure of damages asserted by plaintiff for the claims of damaged wood is based on the fair market value of wood rather than its invoice cost. PPI's senior vice president, Mr. MacMaster, testified that the average profit margin for undamaged wood sold on the market was five percent above cost.

Mr. MacMaster stated that PPI would purchase plywood on a spot market at fair market value to cover for the damaged wood. He estimated that, on average, between two and two and one half percent of the wood in the shipments were damaged, either due to handling or quality control rejection.[5] PPI's factory plant manager, Mr. Fortin, testified that internal factory reports show that, on average, two process panels per bundle are removed from the production line and not processed, due to external damage.

## DISCUSSION OF LAW

### I. *Prima Facie Evidence and the Lumber Clause*

■■■ The Carriage of Goods by Sea Act (COGSA) imposes upon Hyundai, as a carrier, the duty properly and carefully to load, carry, and discharge the goods carried. 46 U.S.C.App. § 1303(2). A plaintiff shipper who seeks to assert the carrier's liability for damage has the burden to prove that the goods were damaged while in the defendant carrier's custody. To prove a prima facie case of damage caused by defendants' negligence, PPI must establish: (1) that the cargo was delivered to the carrier in good order and condition, and (2) that the cargo was discharged from the vessel in damaged condition. *Caemint Food, Inc. v. Brasileiro*, 647 F.2d 347, 352 (2d Cir.1981).

### A. The Goods Were Delivered in Good Order and Condition

■■■ A clean bill of lading, one without notation of damage by defendant carrier, is prima facie evidence entitling the plaintiff to a rebuttable presumption that the goods were delivered to the carrier in good order and condition, which serves to enhance the negotiability of ocean bills of lading. *Insurance Co. of North America v. Dart Containerline Co.*, 629 F.Supp. 781, 783 (E.D.Va.1985); 46 U.S.C.App. § 1303(4). The defendants raise the lumber clause as a qualifier to the otherwise clean bill of lading, arguing that the lumber clause prevents the establishment of prima facie evidence of good condition of the plywood by the mere presentation of bills of lading that are without notation of damage.

The lumber clause states that the representation of apparent good order and condition of the plywood is not a representation as to the absence of breaks, cracks, stains, shaves, warps, shakes, splits, holes, or broken pieces. The plaintiff argues that the lumber clause is invalid under COGSA, 46 U.S.C.App. § 1303(3), (8), and that the bill of lading is evidence that the goods were "in apparent good order and condition," as stated on its face.

■■ If a shipper requests a bill of lading, COGSA expressly requires the carrier to state the apparent order and condition of the goods on the bill of lading. 46 U.S.C.App. § 1303(3)(c); *Dart*, 629 F.Supp. at 783 n. 1. A carrier is obligated to note on the bill of lading those conditions indicating damage that opportunity for inspection should have revealed. *Philipp Bros. v. M/V "Sabogal"*, 490 F.Supp. 975, 981 (S.D.N.Y.1980). Section 1303(3)(c) provides that, although the carrier is not required to state any marks, number, quantity, or weight of the cargo when a carrier has no reasonable means of checking those, the carrier is required to comment on the condition of the goods. The carrier Hyundai has a legal duty to note the apparent order and condition of plaintiff's plywood on each bill of lading. Section 1303(3) provides as follows:

(3) After receiving the goods into his charge, the carrier, or the master or agent of the carrier, shall, on demand of the shipper, issue to the shipper a bill of

---

**5.** Process panels with quality defects attributable to the mill in Indonesia are fed into the production line because those defects are not noticed until the quality control inspection, which is performed after the processing.

lading *showing* among other things—
. . .

(c) The apparent order and condition of the goods. . . . (emphasis added).

Thus, where the bill of lading is furnished, it must show the apparent order and condition of the goods. The bill of lading then serves as "prima facie evidence of the receipt by the carrier of the goods as therein described in accordance with . . . [paragraph (3)(c)] of this section. . . ." 46 U.S.C.App. § 1303(4).

■ Hyundai did furnish bills of lading, but did not make any notation of damage on them. Hyundai contends, however, that because of the operation of the lumber clause in fine print on the reverse side, the bills of lading are not prima facie evidence of the apparent good condition of the plywood and lack of obvious damage to the exterior of the packages at the time Hyundai received the plywood in Indonesia. Hyundai makes this contention despite the fact that the damage occurs to the exterior of the package and is easily observable. This contention conflicts with the manner in which the parties evidently have interpreted the clause for the previous fourteen years. More importantly, this contention is in conflict with the requirements of 46 U.S.C.App. § 1303(4). In addition, it appears to be an attempt to limit liability.

Under COGSA, clauses that attempt to limit liability for negligence are void. COGSA states:

Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise as provided in this Act, shall be null and void and of no effect.

46 U.S.C.App. § 1303(8).

This Court is unaware of any case law ruling on the effect or validity of a lumber clause. Both parties cite cases concerning rust clauses that attempt to negate the representation on the front of the bill of lading of "apparent good condition" upon delivery to the carrier if there are no nota-

tions on the front of the bill of lading indicating damage due to rust. These rust clause cases concern whether presentation of a bill of lading with a rust clause is prima facie evidence of good condition of the goods upon delivery to the carrier, pursuant to COGSA.

This Court does not find the rust clause cases applicable in this case involving apparent exterior damage to packaged lumber, because rust is a continuous natural phenomenon that occurs generally, without fault or neglect, upon the exposure of metal to air and moisture. To the contrary, the damage herein was easily observable as that occurring to the substance (plywood) from an outside source, rather than from the operation of the substance itself.

Substantial differences exist between Hyundai's lumber clause and the rust clauses in the cases cited by defendants. Defendants cite *Acwoo Int'l Steel Corp. v. Toko Kaiun Kaish, Ltd.,* 840 F.2d 1284 (6th Cir.1988), *on remand Acwoo Int'l Steel Corp. v. M/V Hosei Maru,* 736 F.Supp. 1452 (E.D.Mich.1989), which held that the shipper's presentation of a "clean" bill of lading that included a rust clause does not establish prima facie evidence of the delivery of the goods free of rust. The rust clause in *Acwoo* provided as follows:

The term "apparent good order and condition" when used in this bill of lading with reference to iron, steel or metal products does not mean that the goods, when received, were free of visible rust or moisture. *If the shipper so requests, a substitute bill of lading will be issued omitting the above definition and setting forth any notation as to rust or* moisture which may appear on the Mate's or Tally Clerk's receipts.

*Id.* at 1286 (emphasis added).

In contrast to Hyundai's lumber clause, the rust clause in *Acwoo* explicitly allowed for a substitute bill of lading, on request of the shipper, which sets forth any notation as to rust. The opportunity to request a substitute bill, written into the rust clause, prevents the clause from being violative of § 1303(3). Here, no other bill of lading is available. Moreover, this clause in effect

limits the liability of the carrier contrary to 46 U.S.C.App. § 1303(8). This Court thus finds the *Acwoo* case and its rust clause distinguishable from the case at bar and Hyundai's lumber clause.

This Court similarly distinguishes *Tokio Marine & Fire Ins. Co. v. Retla S.S. Co.*, 426 F.2d 1372 (9th Cir.1970), in which the rust clause, which was printed in capital letters and was the most conspicuous and prominent provision on the face of the bill of lading, provided for a substitute bill of lading for rust information, if requested. *See also Dorsid Trading Co. v. S.S. Rose*, 343 F.Supp. 617, 623 (S.D.Tex.1972) (rust clause on face of bill of lading and in large type specifically provided there would be no description of condition of goods regarding rust unless shipper requested substitute bill of lading.)

Defendants also cite *Gradmann & Holler v. Continental Lines, S.A.*, 504 F.Supp. 785 (D.C.P.R.1980), which held that the shipper did not establish a prima facie case of good condition because the bill of lading was considered not "clean" when the bill of lading stated that the contents were unchecked by the carrier and the master of the vessel had no reasonable means to ascertain the condition of the cargo. In the case at bar, unlike the *Gradmann* case, any damage to the exterior of the packaged wood would have been readily apparent upon delivery to Hyundai and must be shown on the only available bill of lading.

The cases cited by defendants do not support their proposition that Hyundai's lumber clause prevents the establishment of a prima facie case of good order and condition upon presentation of the bills of lading without notation of damage. In a recent case involving Hyundai's bill of lading, *Sumitomo Corp. of America v. M/V St. Venture*, 683 F.Supp. 1361 (M.D.Fla. 1988), the court found the location on the back in fine print of the rust clause and the lack of availability of a substitute bill of lading to be material factors in the analysis of such a clause's validity under COGSA, 46 U.S.C.App. § 1303(8). Accordingly, in *Sumitomo*, the court held Hyundai's rust clause to be invalid under COGSA as a limitation of liability.

The Hyundai lumber clause, in fine print on the reverse side of the bill of lading at paragraph 20, fails to apprise the shipper of an opportunity to request a substitute bill of lading noting any damage to lumber known to the carrier. This Court finds that Hyundai's legal duty under COGSA, 46 U.S.C.App. § 1303(3), is to note the apparent order and condition of the goods; the lumber clause is in conflict with that duty. Hyundai's lumber clause is neither conspicuous nor on the front of the bill of lading. It does not explicitly offer a substitute bill of lading upon request by the shipper, and it has not been raised by Hyundai in fourteen years of its course of dealing. It fails to note any apparent condition of the goods other than that set forth on the front of the bill of lading, which provides "in apparent good order and condition unless otherwise stated hereon."

The Court finds that the lumber clause is an invalid attempt to relieve Hyundai of its obligation under § 1303(3)(c) to provide a bill of lading showing the apparent exterior order and condition of the goods; further, the Court finds it is an attempt to limit liability contrary to § 1303(8). The Court holds that the plaintiff has established prima facie evidence of the good order and condition of the plywood upon delivery to Hyundai for shipping, which is the first element of a prima facie case of carrier liability for damage.

**B.  Discharge from the Vessel of the Goods in Damaged Condition**

The second of the two elements of a prima facie case of carrier liability for damage is that the cargo was discharged from the vessel in damaged condition. The survey reports introduced into evidence and the undisputed testimony of the surveyor establish with specificity the amount of wood with apparent exterior damage in each shipment delivered by Hyundai. The plaintiff presented a prima facie case of damage caused by the carrier that the defendants did not rebut; therefore, the

Court now turns to the proper measure of damages to be awarded to the plaintiff.

## II. *Damages*

### A. Effect of the Settlement Clause

■ Defendants assert that the settlement clause at paragraph 22 of the bill of lading limits the amount of plaintiff's damages, as does the common law duty to mitigate damages. The plaintiff contends that the settlement clause should not limit the damages; plaintiff asserts the clause is violative of COGSA and does not apply in cases that are litigated in court. The settlement clause, by its own language, states that the designated measure of damages applies to any claim for which the carrier may be responsible. The plaintiff has never before presented its claims for more than the invoice cost, freight and insurance, and the parties have never resolved a claim for which the carrier was responsible for any amount more than this. This Court finds compelling the parties' interpretation of this clause over the past fourteen years. It is too late in the course of dealing for one party to ask the Court to interpret a clause differently than the parties have both contracted for and interpreted over many years, and thereby change the rules unilaterally after · fourteen years. This Court finds that the settlement clause applies to claims presented, whether they are presented in or out of court. However, even if the settlement clause does not apply, the Court's award of the measure of damages would not change. The damages are limited due to mitigation and limitation to actual loss.

In plaintiff's post-trial brief, PPI asserts that, if the defendants contend that the settlement clause applies, then plaintiff is entitled to the entry of an award for the net invoice costs plus freight and insurance, without the subtraction of salvage recovery sales, in strict adherence to the clause which does not explicitly provide for mitigation by its terms. In the plaintiff's

post-trial brief, the plaintiff stated that it "moves the Court, pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, to amend the Complaint to increase the amount sued for to $679,578 to conform to the evidence."

The amount of damages awarded by this Court would be the same whether the 15(b) motion were granted or denied.[6] The Court will not award a windfall to the plaintiff. Instead, the Court finds that under the common law, the plaintiff has a duty to mitigate and it actually did so. Therefore, the damages will be reduced by the recovery of salvage sales.

■ Even if the settlement clause did not apply, the plaintiff nevertheless would not be allowed to recover for losses based on the fair market price rather than on landed cost. Although a carrier's liability ordinarily is measured by the difference between the market value at destination if the shipment had arrived in good condition and the market value of the damaged goods, losses may be calculated by a measure other than market value if that measure is more accurate. *Dixie Plywood Co. v. S.S. Federal Lakes*, 404 F.Supp. 461, 465 (S.D.Ga.1975), *aff'd* 525 F.2d 691 (5th Cir. 1975), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2174, 48 L.Ed.2d 798 (1976).

Title 46 U.S.C.App. § 1304(5) provides that the carrier shall not be liable for more than the amount of damage actually sustained. The United States Court of Appeals for the Fourth Circuit interpreted this provision in *Caterpillar Overseas, S.A. v. Marine Transport, Inc.*, 900 F.2d 714, 724–25 (4th Cir.1990), and disallowed recovery for loss of profit or consequential damages where a more accurate means of ascertaining loss was available. Here, a more accurate means is available.

A reasonable businessman who regularly receives shipments of thin sheets of plywood, and who is aware that approximately one to two percent of the plywood shipped will be damaged and unable to be fed into

---

**6.** The Court DENIES plaintiff's motion pursuant to Rule 15(b) to amend the complaint to increase the amount sought as recovery as $679,-578 to strictly conform to the settlement clause.

The Court finds that this issue was not tried by express or implied consent of the parties and that there was no evidence adduced at trial concerning the subject of the motion.

the line, would order additional plywood to cover that steady deficiency. Fourteen years of shipments would provide a sufficient basis for awareness by a reasonable receiver of shipments of the problems of damage during shipment between Indonesia and America and for anticipation of the loss. This Court finds that it would be unreasonable for PPI not to anticipate the average minimal amount of damage after a few shipments, and that PPI should have known and did know through experience that some one to two percent would be damaged.

The evidence demonstrated that PPI was aware of the average loss. The plant manager testified that, in his experience, physical damage occurs before the wood reaches the production line, and that one percent of the wood was not fed into the line. Thus, where a business either does know or should know of the average loss, it reasonably can mitigate the expected loss merely by ordering additional wood or material.

The landed cost of PPI's plywood is less than a spot price of plywood at fair market value. Plaintiff could replace the wood at a lower cost in the exercise of reasonable care. This Court finds that PPI had a duty to mitigate damages by ordering additional plywood from PPI rather than by purchasing cover on the spot market. Moreover, the Court finds that there was no showing of any problem of the plaintiff other than the direct damage. The plaintiff fully anticipated that the shipping would cause exterior damage. This Court finds that the plaintiff was neither blind nor stupid, and it operated the business on sound business principles. It should have and did order additional wood in anticipation of regular shipment damage; therefore, it is not entitled to a windfall.

**B. Salvage Handling Costs Awarded in Part**

PPI claims $100,829.09 in damages for what it asserts are salvage handling costs. Plaintiff's plant manager testified that the salvage handling cost totaled $23.19 per one thousand square feet of damaged wood.

The total $23.19 per one thousand square feet consisted of $1.19 for labor to sort the damaged wood and $22.00 for the lost productivity due to the removal of damaged panels. PPI's senior vice president testified that the $22.00 per one thousand square feet represents the failure to meet established production standards. These business interruption costs sought by plaintiff amount to $21,489 lost per day.[7]

The plant manager, Mr. Fortin, furnished the figures and testified that one minute of time for feeding the line was lost for every damaged piece of wood that was removed from the line by the employee who would otherwise be feeding the line. He explained that, while an employee is removing a damaged panel, no one continues to feed the line. There was testimony that twenty-nine boards per minute could be fed into the line for processing during that minute while a damaged panel was being removed. This was clearly not the case during the Court's view of the production line.

Upon the Court's suggestion to visit the PPI factory, the Court and the parties observed the feeding of the production line and observed damaged wood being removed from the line. The factory workers were not given any notice that the Court was observing, and neither party contends that the workers altered their working patterns while they were observed. The Court was impressed with the efficiency of the

---

7. PPI's factory runs three shifts a day. At maximum output, each shift has the capacity to process 10,000 panels per shift. The 10,000 panels are in approximately fifty bundles, and a PPI internal report estimates that on the average two panels per bundle are damaged and removed from the production line. PPI presented testimony that the employee on a line uses a minute to remove a panel and place it on a rack, and that during one minute the line could have been fed twenty-nine panels. The plant manager testified that 2,900 panels per shift would not be processed due to the time lost removing damaged panels. The 2,900 is multiplied by three (for the three shifts) to obtain the quantity of 8,700 panels of missed capacity. The plant manager further testified that his standard plant cost per panel of $2.47; multiplied by 8,700 panels, the result is $21,489 lost per day.

production line and the employees. This Court finds the testimony concerning the business interruption costs to be incredible and the damages sought by PPI to be grossly overestimated. This Court discounts that testimony completely as having no relation whatsoever to the amount of time or money actually lost.

PPI also claims that it suffered losses as a result of allocating labor resources to sort the substantially damaged bundles. This Court awards $1.19 per one thousand square feet of damaged wood for the reasonable cost of the sorting of damaged bundles. However, this Court does not award business interruption costs claimed as part of salvage handling costs, because the Court rejects the testimony presented by PPI as bearing no relation to the actual loss. PPI has not presented any additional evidence specifying or asserting in providing any basis for determining this component of damages other than $1.19 per one thousand feet for sorting damaged wood.

C. Survey Costs

■ The plaintiff seeks the full amount of the survey costs, asserting that if there were no damage, there would be no need for surveys. The defendants assert that the settlement clause disallows consequential damage and that the survey costs should not be awarded. It was stipulated at trial that PPI's surveyor Mr. Dailey would testify that twenty-five percent of the total cost of hourly rates was due to additional time devoted to surveying damage. The Court found Mr. Dailey to be a very credible witness who exhibited no bias. The Court finds that additional survey costs attributable to exterior damage to be the twenty-five percent additional time spent evaluating damage, and that these costs are the only portion of the survey costs that are a direct damage representing actual loss. The Court awards the twenty-five percent of the survey costs, which is $2,537.

D. Prejudgment Interest

■ Allowance of prejudgment interest is in the sound discretion of the court, and is the norm in admiralty cases. *United States Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820 (4th Cir.1992); *Ameejee Valleejee & Sons v. M/V Victoria U*, 661 F.2d 310, 313 (4th Cir.1981). This Court grants prejudgment interest from the date of delivery of each shipment. Interest runs from the date of delivery of each shipment as each represents a separate cause of action.

Courts are not bound by state statutory maximum rates in setting the rate of prejudgment interest in admiralty cases while bearing in mind the current commercial rate. *See Ameejee Valleejee,* 661 F.2d at 313. The state rate of interest at eight percent per annum clearly is in line with the current commercial rate. Accordingly, the Court awards prejudgment interest at a rate of eight percent per annum from the date of the receipt of shipment until this date.

*Conclusion*

This Court finds that, in this case, the lumber clause in Hyundai's bills of lading does not prevent the bills of lading from giving rise to the presumption that the cargo was delivered in good condition, free from readily observable exterior damage. The Court finds that the lumber clause is void and invalid under COGSA as to the facts of this case. The plaintiff's production of clean bills of lading along with proof of exterior and visible damage at the delivery to plaintiff establishes a prima facie case of defendant carrier's negligence in connection with this type of damage which is observable on the exterior of the bundles. Regardless of whether the settlement clause is valid, it will not award damages that are indirect or damages for losses that plaintiff had a duty to mitigate and already has mitigated. Moreover, the plaintiff has adopted the settlement clause over the time that the parties have dealt with each other. The Court awards the plaintiff damage for loss calculated as invoice value minus the selling price of the salvage wood, plus the labor cost for sorting damaged wood ($1.19 per thousand square feet), plus twenty-five percent of

the survey costs ($2,537.00). The plaintiff is hereby awarded prejudgment interest from the date of delivery of each shipment until the date of this opinion at eight per-cent per ·annum.

The Clerk is DIRECTED to send a copy of this opinion to counsel for both parties who will submit within seven (7) days a judgment order in conformity with this opinion which shall be entered *nunc pro tunc* as of today's date in the fifty-four claims.

IT IS SO ORDERED.